FIRST NATIONAL REALTY CORPORATION, ET AL. *v.* WARREN-EHRET COMPANY, INC.

[No. 375, September Term, 1966.]

*Decided October 16, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, OPPENHEIMER, MCWILLIAMS and FINAN, JJ.

*Charles E. Channing, Jr.,* with whom were *Sasscer, Clagett, Powers & Channing* on the brief, for appellants.

*C. Edward Hartman, II,* with whom were *Hartman & Crain* on the brief, for appellee.

FINAN J., delivered the opinion of the Court.

The circumstances leading up to this case are illustrative of the proverb that haste makes waste. In this instance haste also made for litigation. The appellant, First National Realty Corporation, a real estate development company, contracted with S. Klein Department Stores, Inc. for the construction of a large store in Greenbelt. Beltway Regional Center, Inc., the primary contractor, and also an appellant, on May 7, 1963, subcontracted with Warren-Ehret, the appellee, for the installation of a 20-year, bonded, built-up roof, with exterior flashing and waterproofing for a total price of $58,000. The subcontractor's work and materials were to be subject to the approval of the contractor and/or the architect. Furthermore, the installation of the roofing material was to be under the direction of a representative of the roofing manufacturer, Johns-Manville. The contract provided that time was of the essence.

This particular roofing consists of "built-up" layers applied in a sandwich fashion. Over the poured concrete base (which is the job of a different trade) the roofer sets a two-ply vapor barrier, consisting of roofing felt laid in hot bitumen or asphalt. Over a cover layer of hot bitumen, workmen imbed a two-inch insulation board, and over this four more plys of felt. Finally, a cover of hot bitumen is applied and white stone chips are spread over this layer as a protection from the heat of the sun.

Under normal conditions, and following customary trade practices, the roofer would start to work from the middle of the roof, working outwards while the prime contractor completed the side walls which extend above the roof level. When the roofers met the wall, the four-ply felt and a layer of flashing would bind up the inside of the extended portion of the wall. The prime contractor would then top out the completed wall and the roofer's own subcontractor would put aluminum flashing on

the top of the wall to complete the roofing job. Only then would the roof be watertight. It also appears from the evidence that the roof is of a somewhat delicate nature. Normally, it is not put up until other trades have completed their work, so as to avoid abuse or damage by men, machinery and materials.

Unfortunately, in the present case, normal trade practices were the exception rather than the rule. By the terms of the lease, Klein's was exempted from substantial rents if the building was not ready for occupancy by November 1. However, Warren-Ehret was not able to commence the roofing until June 28, when the roof base was complete, at which time construction was an estimated 15% behind schedule. As a result Beltway felt obligated to press its subcontractors, including Warren-Ehret, to a point where working conditions became quite difficult. On portions of the completed roof Warren-Ehret had to contend with scaffolding, debris, bricklayers, masons, and a thousand-pound fork-lift truck traveling over the completed roofing with 800-pound loads of bricks, all impedimenta from other contractors.

During this time Hans Schroeder, the job foreman, maintained his pressure on the roofer and refused to provide protective material for the roof. Stephen Zeiba, vice-president of both Beltway and First National, constantly sent telegrams from his Washington, D. C. office to the effect that the roofer was holding up completion of the job, and was supplying an insufficient number of workmen. During July, Zeiba also sent several telegrams to Warren-Ehret's home office in Philadelphia, alleging specific acts of delay, all of which were unsupported by the record in the lower court. Finally on August 12, Zeiba wired a notice of default to the roofer on the grounds of delay.

During the afternoon and evening of August 20, a vicious rain squall dropped four inches of rain in the area, and water and mud poured into the building's first floor and basement. Although the record indicates that it entered through open doors and sides, Zeiba maintained that it was the ultimate result of the roofer's inadequate performance. On August 24 and without informing Warren-Ehret, Zeiba employed Alcrymat Corporation to complete the roofing work. And on August 30, Warren-Ehret was ordered off the job and all equipment and

656

material was seized by Beltway. About this time, an inspection of the roof was made by Warren-Ehret officials and the Johns-Manville representative. They found the roofing complete and acceptable except for a few edges where work was delayed by unfinished walls, and a few small areas where other trades were storing materials. The architect's inspection similarly failed to produce any objections to the roofing job.

Warren-Ehret filed a petition to foreclose a mechanic's lien in the Circuit Court for Prince George's County, claiming payment for work done and equipment on the site, less June and July payment. Appellants counterclaimed for expenses resulting from Warren-Ehret's alleged defaults and delays. On May 11, 1966, the court dismissed the counterclaim and awarded the roofer $28,368.21. Judge Meloy found that, although the impending deadline created tensions which generated great personality differences between Zeiba and the Warren-Ehret officials, the roofer substantially performed his side of the contract, and therefore termination was not legally warranted.

The appeal, however, is not based upon a material breach by the roofer, but upon the theory that by the terms of Article 25 of the contract itself, Warren-Ehret may be removed if *"in the opinion of the contractor,* [the roofer] shall fail in any respect to prosecute the work with promptness, or cause by any action the stoppage of or interference with the work of other trades * * *."* (Emphasis supplied.) Even though the appellants concede that from the evidence the court could have found that Warren-Ehret had substantially performed the contract, they argue that their decision to terminate the contract was based on their opinion that the subcontractor failed to perform, arrived at without fraud or bad faith. By refusing to consider the fair opinion of the contractor, appellants feel that the lower court decided the wrong issue; the question being not one of substantial performance, but rather of appellants' honest belief that the subcontractor failed to adequately perform under the contract.

If we were concerned with only the question of substantial performance, this case could be put to rest with the decisions of this Court in *Gamble v. Woodlea Construction Co., Inc.,* 246 Md. 260, 228 A. 2d 243 (1967), *Evergreen Amusement Corp.*

*v. Milstead,* 206 Md. 610, 621, 112 A. 2d 901 (1955), *Parker, et al. v. Tilghman V. Morgan, Inc., et al.,* 170 Md. 7, 183 A. 224 (1936) and *Hammaker v. Schleigh,* 157 Md. 652, 147 A. 790, 65 A.L.R. 1285 (1929).

However, this case presents the further question of the effect to be given the express wording of the contract set forth in paragraph numbered "Twenty-fifth" which specifically provides that the "opinion" of the contractor will control in deciding whether the subcontractor (Warren-Ehret) prosecuted the work with promptness and diligence or failed in the performance of any of the agreements contained in the contract.

There are a number of Maryland cases which have dealt with the question of the performance of a contract to the satisfaction of one of the parties, however, with one exception, they have been concerned with the delivery or sale of raw materials, commodities, manufactured products, or an acceptable title to land. In *B. & O. R. R. Co. v. Brydon,* 65 Md. 198, 3 A. 306, 9 A. 126 (1886), the subject matter was coal of a certain quality; in *Lynn v. B. & O. R. R. Co.,* 60 Md. 404 (1883), it was ice of a desired consistency; in *Goldberg v. Feldman,* 108 Md. 330, 70 A. 245 (1908), it was the question of acceptable wording in a deed of conveyance to land; in *Devoine Co., Inc. v. International Co., Inc.,* 151 Md. 690, 136 A. 37 (1927), it was the quality of cherries; in *Frankfort Distilleries, Inc. v. Burns Bottling Machine Works, Inc.,* 174 Md. 12, 197 A. 599 (1938), it was the suitability of machinery to perform a specific function; and in *Ferris v. Polansky,* 191 Md. 79, 59 A. 2d 749 (1948), it was the satisfactory performance of a dance band. The rule applied by the Court in these cases was that the purchaser's opinion as to satisfaction controlled in the absence of fraud or bad faith. It should also be noted that these cases dealt with matters essentially affecting personal taste or suitability for a specific function.

The only Maryland case brought to our attention, or which the Court has been able to find involving a construction contract, wherein the contract expressly stated that work was to be performed to the owner's satisfaction, is *Geiger v. Western Maryland R. R. Co.,* 41 Md. 4 (1874). This case embraced two contracts for the construction of substantial segments of the

Western Maryland Railroad and provided that if the contractor should not comply from time to time with the stipulations on his part to be performed, in manner and form and within the time stipulated or in case it should appear to the railroad's chief engineer that the work did not progress with sufficient speed, then the chief engineer, after due notice in writing, could annul the contract. Judge Robinson, speaking for the Court, said at p. 13:

> "It is by no means unusual to find in contracts for railroad construction, provisions not only referring to the sole and absolute determination of the company's engineer, the monthly estimates as to the quantity, character and value of the work done, but also provisions conferring upon him the power to annul at any time the contract, if the work should not progress with that speed which he in the exercise of his judgment might think proper. However stringent and arbitrary such provisions may seem at first sight, when we consider the character and magnitude of works of this kind, and the vital importance of having the construction completed within a given time, often prescribed by their charters, we can understand the necessity of guarding against breaches on the part of the contractors by covenants of the strictest and most imperative character. Be this however as it may, it is well settled that when such power is conferred by the contract on the engineer, the exercise of it by him, in the absence of proof of bad faith, is binding upon the parties."

However, a review of the facts of *Geiger* shows little parallel with the case before us. In *Geiger* there is no indication as to whether the contractor had approached "substantial performance" and at least with regard to the work embraced in one contract, the work had apparently been abandoned by the contractor.

A review of cases generally covering contracts wherein something was to be done or provided by one party to the contract to the satisfaction of the other party shows that they are divided into contracts involving realty, contracts for personal services,

contracts for commodities of specified quality, contracts for goods that suit the buyer's satisfaction, contracts for machines of certain operative fitness or mechanical utility and construction contracts. See 86 A.L.R. 2d 194, 202 (1962), 44 A.L.R. 2d 1114 (1955), 13 Am. Jur. 2d, *Building and Construction Contracts,* § 30 (1964). The Courts have not applied the same rule of law to all of them and we do not intend here to delineate what we deem to be the law applicable to the various categories beyond that with which we are directly concerned, namely, a construction contract which is to be performed to the satisfaction of the owner (contractor in this case), and which at the time of cancellation had been substantially performed by the subcontractor.

There is a split among authorities as to what criteria should be applied in judging what the "owner's satisfaction" means in construction contract cases. There are divergent views as to its connotation and they are succinctly set forth in 13 Am. Jur. 2d, *Building and Construction Contracts,* § 30, p. 32.

> "It has often been held that one who has performed work under a building or construction contract conditioning the obligation to pay for the work upon the owner's satisfaction is entitled to recover, as against the owner's claim of dissatisfaction, if the work done is such that a reasonable man would be satisfied by it. Under this rule, the owner's satisfaction is determined by objective criteria, and the question whether the owner, as a reasonable man, should have been satisfied with the work, is a question of fact. The reasonable-man test has been rejected in other cases, however, which hold that one for whom work is done under a building and construction contract containing such a clause is not liable for the contract price if there is no actual personal satisfaction. Nevertheless, even under the latter view, the owner's claim of dissatisfaction must be made in good faith, and this is ordinarily a question of fact for the jury."

Certainly, under the "reasonable man" test this Court would experience no difficulty in affirming the trial judge's findings

that Beltway's arbitrary removal of Warren-Ehret (the subcontractor) from the job was not the action of a reasonable man, and further, upon the facts contained in the record, Beltway, as a reasonable man, ought to have been satisfied with the work.

However, it is the opinion of the Court that under either of the views above expressed the lower court should be affirmed.

A review of all of the cases cited in support of both views shows that regardless of whether the objective criteria (i.e. reasonable-man rule) or subjective criteria (i.e. the individual personal satisfaction of the owner) must be met, the Courts, with few exceptions, have asked the question whether the action on the part of the owner was capricious or arbitrary, and if such action was present it vitiated the quality of the reasonableness of the owner's action in the objective criteria cases and his good faith in the subjective criteria cases.

3A Corbin, *Contracts* § 646 (1960) comments on *Duplex Safety Boiler Co. v. Garden,* 4 N. E. 749, 101 N. Y. 387 (1886), a case involving the installation of boilers wherein the Court adopted the "reasonable man" test, in the following language:

> "The result reached in this last case has very generally been reached, by the application of a similar rule, in building contracts and in contracts for work and materials. Sometimes this is so in the very teeth of express words making personal satisfaction a condition of the defendant's duty."

It is of interest to note that this Court in *Simpson v. Prudential Ins. Co.,* 227 Md. 393, 406, 177 A. 2d 417, 425 (1962), in adopting an objective criteria to determine the standard of insurability of an insured whose physical fitness was under question, cited, in the language of the Court, "somewhat by analogy" 3A Corbin, *Contracts* §§ 644, 645, and 5 Williston, *Contracts* § 675B (3d Ed. 1961), wherein the "reasonable man" test is discussed.

In *Thompson-Starett Co. v. La Belle Iron Works,* 17 F. 2d 536 (2d Cir. 1927), Judge Learned Hand took an inflexible view of the subjective criteria test in a case which he described

as a "hard one," however the majority opinion was accompanied by a vigorous dissent which stated:

> "It will not do to merely bluntly announce that there was good faith in the dissatisfaction of this superintendent. Dissatisfaction must be founded on cause. It may not be arbitrary or unreasonable. If it is arbitrary action, it amounts to a legal fraud." *Id*. at 564.

Many years later a liberalization of the subjective criteria test, and one followed in many jurisdictions, was expressed by the Pennsylvania Supreme Court in *Hood v. Meininger*, 377 Pa. 342, 105 A. 2d 126, 44 A.L.R. 2d 1106 (1954), where the Court in rejecting the "reasonable man" test and adopting the subjective criteria test, found in favor of the owner and against the contractor stating:

> "The contract in the Gerling case being one in which performance was conditioned on the satisfaction of the owner, the test of adequate performance was not whether the owner ought to have been satisfied but whether she was satisfied. * * *. There are, however, two limitations inherent in this principle: (1) that the dissatisfaction must be genuine and not prompted by caprice or bad faith, and (2) that if the work is not sufficiently completed for a reasonable determination whether it was or would be satisfactory, then the rejection is premature." *Id*. at 347, 105 A. 2d at 128.

As previously noted, the opinion of the lower court in the instant case contains language which gives rise to the inference that Beltway's action in terminating the contract with Warren-Ehret was capricious and arbitrary, thus affecting the quality of the appellants' action under either the "reasonable man" test or the subjective criteria test. Judge Meloy, the finder of facts, stated:

> "After six days of trial and argument and after having studied the contract between the parties, the mechanic's lien and all exhibits and after having observed the demeanor of the witnesses and the quality

of their testimony, the Court is of the opinion that the Roofer proved his case by a fair preponderance of the evidence and that the Roofer was in substantial performance and compliance with his contract and that the contract was not legally defaultable. Truth and error were everywhere and so intimately mixed to be almost undistinguishable. The zeal exhibited by the Contractor and his superintendent reflected the drive of the Owner to complete the job on time. Constant pressure on the Roofer as well as upon the other subcontractors created personality conflicts between the Contractor in the person of Stephen Zeiba and Mr. Tinney in charge of the job for the Roofer and when the rains came on August 20, 1963, a veritable flood of four or five inches of precipitation within a very short period of time, *the fall which inundated parts of the building, snapped the patience of the Contractor and triggered the dismissal of the Roofer and the termination of the contract."* (Emphasis supplied.)

This Court is of the opinion that the evidence demonstrates that the appellant acted arbitrarily in the matter of removing the appellee from the construction project and that such capricious action prevented the appellant from exercising in good faith its prerogative of termination in the event the work did not proceed to its satisfaction.

*Decree affirmed, with costs.*