## VOLOS, LTD. *v.* SOTERA

[No. 140, September Term, 1971.]

*Decided January 17, 1972.*

156

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Edward L. Blanton, Jr.,* with whom were *Daniel W. Cagan* and *Adelberg, Rudow & Blanton* on the brief, for appellant.

*Gordon D. Fronk,* with whom were *J. M. Dryden Hall, Jr.,* and *Little & Hall,* P.A. on the brief, for appellee.

BARNES, J., delivered the opinion of the Court. DIGGES, J., dissents. Dissenting opinion filed January 26, 1972, at page 177 *infra*.

The appellant, Volos, Ltd., the plaintiff and cross-defendant below (Volos), urges us in this appeal to hold that the Circuit Court for Baltimore County (Proctor, J.) erred in entering a judgment for $8,791.45 in favor of the appellee, Frank P. Sotera, the defendant and cross-plaintiff below, on two grounds, *i.e.*, (1) the lower court allegedly applied an erroneous rule of law in interpreting the employment contract between the parties in regard to the termination of Sotera's employment and (2) erred in holding that Sotera had used reasonable diligence in seeking other employment in mitigation of the damages resulting from the termination of Sotera's employment by Volos.

After the discharge of Sotera from employment by Volos on April 6, 1970, Volos filed an action at law in the Circuit Court for Baltimore County on May 21, 1970, to recover $12,041.93 which Volos had loaned Sotera in various amounts from August 29 to November 24, 1969. There is no dispute that the amount claimed was loaned to Sotera and was due and payable to Volos. Sotera, however, on June 15, 1970, filed a counterclaim alleging a wrongful discharge by Volos in violation of an employment contract between the parties and claimed damages of $75,000.

The trial court, sitting as a jury, gave a carefully considered oral opinion at the conclusion of the testimony and concluded that Sotera's discharge by Volos was not for cause as provided in the employment contract. Judgment for the defendant and cross-plaintiff, Sotera, for $8,791.45 was ultimately entered from which a timely appeal was taken by Volos.

Volos was incorporated in Maryland in October 1967 by Charles H. Flanders who, with his wife, purchased all of the original issue of corporate stock. Later, a public offering of the shares of the corporation was made.

1,098,000 shares were outstanding at the time of trial at which time, however, Mr. and Mrs. Flanders were not majority stockholders.

Flanders had a business of his own, United Service Bureau, a credit bureau, which he had founded. He had been the President and Chairman of the Board of United Service Bureau for 27 years. He became Chairman of the Board of Volos when he owned a controlling interest of its stock.

Volos was originally formed to manufacture a new drug which would allegedly grow hair. It became apparent, however, that to obtain the approval of the drug by the Federal Food and Drug Administration (FDA) would be difficult, time consuming and expensive. Volos then decided to sell a hair preparation in cosmetic form in order to provide capital while it continued the investigation of the new drug with the expectation of completing that investigation and obtaining FDA approval.

In the autumn of 1968, Volos advertised in the Wall Street Journal and the New York Times for a marketing executive. There were 54 applicants. Of these applicants, the Board of Directors of Volos decided that Sotera had the necessary expertise to operate the corporation. He had impressive credentials. After graduating from high school and preparatory school, he graduated in 1952 from Burdett College, Boston, Massachusetts, with a major in business and marketing. Thereafter, he was employed by the Fourgan Company, a drug and pharmaceutical corporation, in New York City as a management trainee, leaving that company, after some eight years, as Advertising Manager and with approximately 10 persons under his direct supervision. Thereafter, he was employed by the Denver Chemical Manufacturing Company as Advertising Manager, and later as Director of Corporate Advertising, having charge of all of that corporation's advertising in its consumer drug, prescription drug and laboratory divisions. He was later employed by an advertising agency, Haggelmann and Bartolone, in New York City as Vice President supervising that agency's

national accounts for consumer drug products, prescription drugs and toiletry items. He was paid a salary of $25,000 per annum by that firm when he saw the advertisements of Volos for a marketing executive.

Sotera responded to the advertisements, had several conferences with Flanders in New York and Baltimore as a result of which a written employment contract was executed by Sotera and Volos, Volos being designated as "Employer" and Sotera as "Employee."

This employment contract provided for Sotera's employment by Volos for three years and that he would "faithfully and diligently" serve Volos "as Executive Vice President and General Manager and Director" and "such other related duties as may be delegated to him by the chief executive officer" of Volos "including duties with Reine Pharmaceutical Corp., a subsidiary" of Volos and in particular Sotera should "be responsible for supervising and directing marketing-research, product development, merchandising, advertising, promotion, sales management and customer service." The salary was $30,-000 per annum; and there was a provision in the contract for reimbursement for the first three months of travelling expenses to and from New York and apartment rental, plus moving expenses. Sotera was also given an option to purchase 10,000 shares of stock of Volos at $5 a share, the option to be exercised within three years from the date of the contract. There was also a provision whereby Volos agreed to reserve an additional 10,-000 shares for possible future stock options of Sotera.

Paragraph 4 of the employment agreement in regard to termination of employment is of special importance in the present case. It provides:

> "4. This agreement may be terminated for cause by Employer, including but not limited to Employee's failure to perform his duties in a satisfactory, competent, and reasonable manner, and is also terminated by the death of Employee or by a disability which would cause Employee

to be disabled for a period of three (3) months, and thereby prevent him from performing his regular and normal duties. Disability shall mean any mental or physical illness such as, in the opinion of Employer's physician, to preclude Employee from the proper performance of all of his duties pursuant to this agreement. In the event, however, Employee suffers any disability during the term of this agreement which reoccurs during the term of this agreement, then the time missed by the Employee by virture [*sic*] of the same disability shall become cumulative; that is, if the days during which the Employee is disabled total ninety (90) during any period of one (1) year beginning from the date that Employee first becomes disabled, then this shall constitute a disability under the terms of this agreement and thereby terminate said agreement. In the event that this agreement is terminated by virtue of Employee's disability, no severance pay is to be paid to Employee."

Sotera, during the period of his employment by Volos —December 17, 1968, to April 6, 1970—developed and implemented plans for marketing the product. He recommended various persons for employment and helped to prepare the operating budget. He recommended various expenditures as well as the choice of an advertising agency for the corporation. He selected five of the eight marketing areas for the product, reviewed sales reports and financial statements and attempted—without success—to obtain additional financing for the company. He generally ran the day to day operations of Volos.

On one occasion, Sotera prepared a statement indicating recommended reductions in corporate spending; but this statement was torn up by Flanders. Sotera emphasized in his testimony that all major decisions were made by Flanders, as Chairman of the Board. Flanders helped to prepare the operating budget and to select

the advertising agency. Flanders selected three of the eight marketing areas—Baltimore, Washington and Puerto Rico—contrary to Sotera's recommendation.

Lawrence E. Biemiller, the past Treasurer of Volos, in his testimony on behalf of Sotera, stated that all major decisions were either made or cleared by Flanders. He testified that Sotera did "a very good job," notwithstanding that he was "hampered" in the performance of his duties by Flanders, through the inability of Flanders to make decisions, the absence of Flanders for a week or two weeks at a time during which he could not be reached and Flanders' heavy drinking at meetings attended by him.

At a meeting in Flanders' office on March 11, 1970, attended by Flanders, Sotera, Biemiller and corporate counsel, a sales projection for the first quarter of the calendar year 1970 was discussed. There is some conflict in the testimony in regard to this sales projection. According to the testimony of Sotera and Biemiller, the projection of sales of $200,000 had been prepared by Sotera in the fall of 1968, contingent upon the obtention of new capital into the corporation. This contingent projection was restated at the March 11 meeting by Sotera as an example of what the company could have done if the new capital had been available. Flanders, on the other hand, testified that he understood that Sotera was projecting actual sales for the quarter ending March 31 or some 20 days after the meeting. He stated that he challenged the projection and was shocked by it inasmuch as he knew that sales of the company's product had only amounted to approximately $15,000 for the first two and a third months of the first quarter.

Flanders testified that Sotera had asked his permission to do part-time consulting work for other companies, but that this permission was not given.

In the latter part of March 1970, Sotera took a vacation of a week, the first vacation he had had since beginning his employment with Volos. Both Sotera and Biemiller testified that this vacation was authorized and

approved by Flanders. Flanders denied that he had authorized the vacation. Sotera and Biemiller testified that Sotera had maintained contact with his office by telephone two or three times everyday during the vacation.

Biemiller, initially Comptroller and then Treasurer of the company, testified that Flanders' involvement at the various meetings was "active." All major decisions were cleared through Flanders' office. Sotera testified, as heretofore mentioned, that Flanders became involved many times in the operation of the company; Flanders ultimately was given the responsibility of employing and discharging personnel; and Flanders helped to select the advertising agency. Of the $600,000 in capital raised for the company by its public offering of its shares, substantial sums were expended for legal fees to compensate counsel for resolving some 95 violation charges brought against Flanders by the Securities and Exchange Commission and for personal expenses of Flanders for a chauffeur, automobile and travel.

On March 31, 1970, Sotera wrote Flanders as Chairman of the Board, the following letter:

"On numerous occasions, over the past six months or more, I have explained to you the serious condition of Volos' finances. I have attempted to demonstrate to you the need for substantial additional funds to allow sufficient marketing of the Volos products to enable the Company to become self-sustaining. I have diligently attempted to locate these funds for you personally. I have also recommended methods of reducing current operating expenses. I have brought to your attention the seriousness of the financial situation at Reine, which is coupled with the Volos guarantee of the notes payable to Chase-Manhattan, and have recommended that we follow counsel's advice and close Reine before it requires additional Volos funds. (You were advised on March 23, Chase-Manhattan de-

manded $10,000 payment by March 27, which you elected not to do.)

"Another most pressing and urgent matter is our advertising agency. At this time we have a substantial amount of monies owed to them for advertising. In view of this, it has become obvious in discussions with the agency that they are not amenable to the scheduling [of] new advertising in the present markets or the opening of additional markets until our account is brought up to date. As you are well aware, if our strongest means of selling Volos is removed, namely the advertising, we are then most certainly without means of continuing operations, let alone growth.

"On Monday, March 9, 1970, you informed me that you had three possible sales for a portion of your family interest in the Company, any one of which would result in the infusion of additional funds into the Company.

"After expressing a desire to sell a portion of your family interest in Volos to raise the required funds for the Company, on March 11, 1970, you directed me to cease any negotiations toward that end, choosing the responsibility yourself. With respect to the three possible deals mentioned above, you informed me that positive responses could be anticipated by March 13. To date, you have not informed me of any responses.

"On March 13, 1970, we finally succeeded in receiving a quotation for Officers and Directors Liability Insurance. You have taken that quotation for consideration and have not acted upon it to my knowledge.

"I have attempted to make you realize that the Volos day of reckoning is fast approaching. In our meeting of March 11th, I pointed out that the Company's cash balance as of that evening

was approximately $52,000 and that these monies would be depleted in 30 to 45 days.

"Since you have restricted my activities with respect to raising funds, while at the same time have authorized the transfer of additional funds to Reine, and have not seen fit to implement the recommended expense reduction or to follow counsel's advice with respect to closing Reine, I can see no course of action for Volos, Ltd. other than the total depletion of funds within the approximate period specified above.

"I believe all of our Directors and Officers should be aware of the seriousness of this matter. Counsel has been copied in order that he may be advised as to whether or not this situation should be brought to the attention of the stockholders on April 6th."

A copy of this letter was sent to corporation counsel.

Prior to the Sotera letter of March 31, Dr. Harry M. Robinson, Jr., a dermatologist and consultant for the company, wrote Flanders on March 25, 1970, as follows:

"Early in March I sent you a registered letter announcing my resignation from the Board of Directors of Volos, but stated at that time that I would remain as Medical Director as long as I could see some evidence that action was being taken to correct certain deficiencies.

"The day after you received the letter you called me and told me that there were great things about to occur and that you would show me evidence of this in 'black and white.' You were supposed to have called me the next day and make arrangements to show me this concrete evidence, but this did not transpire.

"The Company is obviously suffering from a lack of funds, and I have had to curtail some of our clinical investigator studies because of this. I am not being completely altruistic because

I would like to see the Company succeed, but under the present circumstances it seems doomed to failure.

"Unless some very definitive action takes place, in the very near future, I will disassociate myself entirely from any connection with the Company.

"I hope to hear from you by return mail."

On April 6, 1970, at 3:00 P.M. the stockholders met at Volos' offices in Baltimore. Neither Sotera nor Biemiller attended this meeting notwithstanding a specific direction by Flanders that they do so. Sotera and Biemiller testified that they had made several attempts to meet Flanders at various times prior to April 6 and that they were generally unable to communicate with him. Sotera decided not to attend the stockholders' meeting because he believed that it would be detrimental to the company, as well as to him, to attend the meeting unprepared to answer questions by the stockholders in regard to the matters set out in the Sotera letter of March 31 to Flanders. For example, Sotera testified that he wanted to know the status of the Reine Pharmaceutical Company, a subsidiary of Volos, which was near bankruptcy. The subsidiary was deeply in debt to the Chase-Manhattan Bank. Its promissory notes, held by the bank, were past due and Volos was the guarantor on those notes. He also wanted to know whether Flanders had obtained new capital for Volos or had sold his interest in Volos to raise capital to meet the urgent needs of the corporation. He further stated that he was not certain that Flanders would attend the stockholders' meeting; that he was concerned that Flanders had not always been truthful with him in the past and he did not know how Flanders intended to answer the questions which the stockholders would ask. He stated: "I could not in conscience be there [at the stockholders' meeting] because I had no idea of the many things that had transpired, and [there were] * * * questions I had in my own mind [that needed to be answered]."

Flanders testified that when Sotera asked for the "itinerary" for the stockholders' meeting over the telephone, Flanders stated that it was "very simple," involving nothing more than the election of directors and the answering of any questions put by the stockholders. It was impossible, said Flanders, to rehearse for the meeting because no one knew what questions the stockholders would ask, and all that was required was that the questions be answered truthfully. He testified further that Sotera telephoned him again and requested the same information, stating that he did not see how Flanders could hold any meeting in view of the embarrassment he would suffer. Flanders directed Sotera to stay at the company's offices until he arrived about 1:00 o'clock—or approximately two hours before the meeting when Sotera would be briefed by counsel in regard to the format of the meeting.

The minutes of the stockholders' meeting indicate, in relevant part, the following:

> "The Chairman stated that the next item on the Agenda was approval of a qualified stock option plan for the employees of the Corporation. One of the stockholders inquired as to the intended beneficiaries of the plan, and the Chairman stated that Mr. Frank P. Sotera, the Executive Vice President of the Corporation, had been promised options for additional shares of stock in the Corporation, pursuant to a qualified plan, and that the Board of Directors had already approved the grant of the options, subject to approval of the plan by the stockholders. Mr. Sotera understood that, as a condition of his employment, the options were to be made available to him. Another stockholder inquired as to why Mr. Sotera and Mr. Biemiller were not present at the annual meeting of stockholders. The Chairman stated that he had directed them to be present, as he was leaving his office, by telephone, but when he arrived at the Company's

offices, neither Mr. Sotera nor Mr. Biemiller were present. Upon investigation, he found they had advised the staff that they would not return until the following morning. Another stockholder inquired as to what, if any, action the Chairman proposed to take as a result of the unauthorized absence of the executive vice president and treasurer of the Corporation. The Chairman said that he was considering several alternatives, including dismissal, but wanted to reserve an opinion until he had an opportunity to talk with Mr. Sotera and Mr. Biemiller to determine why they were not present. A motion was duly made and seconded to reject the proposed qualified stock option plan. Mr. Blanton stated that he could understand the reasoning of those who made the motion, and those who favored it, but in his view, the qualified stock option plan had been approved by the Board of Directors, and the options granted to Mr. Sotera, subject to approval by the stockholders. If the stockholders were to defeat the plan at this point, Mr. Sotera may very well contend that the Corporation had breached its employment agreement with him, and he did not want to have to deal with any unnecessary contentions in his expected litigation with Mr. Sotera. He recommended that the plan be approved, and the options granted."

Resolutions approving the action of the Board of Directors in adopting the employee stock option plans and granting the Board of Directors power to administer and implement it were passed unanimously.

Immediately following the stockholders' meeting, Flanders met with the Board of Directors to discuss the employment status of Sotera. The Board of Directors left the final decision to Flanders; and during the evening of April 6, Flanders sent the following telegram to Sotera:

"PERSUANT [*sic*] TO PARAGRAPH 4 OF YOUR EMPLOYMENT AGREEMENT OF NOVEMBER 22ND 1968 YOUR POSITION WITH VOLLS [*sic*] LTD. IS TERMINATED AS OF 500PM EST TODAY PLEASE ARRANGE IMMEDIATE APPOINTMENT WITH ME TO REMOVE YOUR PERSONAL POSSESSIONS FROM COMPANY PREMISES AND TO RETURN ALL COMPANY PROPERTY AND OR PAPERS THAT MEY [*sic*] BE IN YOUR POSSESSION OR CONTROL
CH FLANDERS CHAIRMAN OF THE BOARD"

At the hearing, Flanders testified that he had been dissatisfied with Sotera since January 1970 and had discussed his concern with Sotera. Sotera, however, introduced a letter dated February 10, 1970, from counsel for Volos to Flanders which discussed an option to be given Sotera to purchase stock of the corporation but with no intimation of any dissatisfaction with Sotera.

After receiving the notice of termination of employment by the telegram of April 6, Sotera looked for employment in both Baltimore and New York; but no employment was available in either city. He and Biemiller later in April formed a corporation known as Cosmetic, Inc., to act as a consultant in regard to the drug and cosmetic business. This project was unsuccessful, Sotera losing some $7,000 or $8,000. Finally in October 1970 Sotera was employed by the Joseph Bartolone Agency, a successor to Haggelmann and Bartolone, by which firm Sotera had been employed prior to his employment by Volos. His annual salary was to be $25,000.

The trial court in its comprehensive oral opinion resolved all important conflicts in testimony in favor of Sotera. The trial court concluded that "Sotera in not being at the stockholders' meeting exercised good judgment," and stated its reasons for this conclusion. It

commented that Flanders knew full well why Sotera and Biemiller were not present at the stockholders' meeting and did not have to talk to them about that, as the corporate minutes indicated. The stockholders were persuaded to authorize the proposed stock option plan and there was no indication by Flanders that he was going to discharge Sotera forthwith, although he had stated this was one of the alternatives to be considered at the informal meeting with the Board of Directors immediately after the stockholders' meeting. No definite conclusion was reached but the matter was left up to Flanders. At 6:24 p.m., however, the telegram was sent to Sotera, notifying him of his discharge. The trial court concluded that "considering all the circumstances, the discharge was not for cause." The trial court also concluded that Sotera had exercised due diligence in an effort to mitigate the damages.

In calculating the damages resulting in the judgment in favor of Sotera for $8,791.45 on his counterclaim, the lower court made the following calculation:

| | |
|---|---:|
| Monthly wage under employment contract $2500 for 6 months—April to end of September, 1970 | $15,000.00 |
| Fourteen months left under employment contract (until November 30, 1971) at $416.67, the difference between $2,500 a month under Volos employment contract and $2,083.33 a month under Bartolone employment | 5,833.38 |
| | $20,833.38 |
| Less amount admittedly owed Volos by Sotera | 12,041.93 |
| Amount of judgment for Sotera | $ 8,791.45 |

We do not find that the findings of fact by the trial court are clearly erroneous, or that his conclusions based on those findings of fact are in error, so that the judgment will be affirmed.

1.

It will be observed that paragraph 4 of the employment contract is somewhat unusual in that it provides that employment may be terminated for *cause* by the Employer and partially defines "cause" as including, but not limited to, the Employee's "failure to perform his duties in a satisfactory, competent, and reasonable manner." It may well be argued that this language changes *by contract* the usual rule that in employment contracts the "subjective" rather than the "objective" or "reasonable man" standard of what constitutes "sufficiency" of performance prevails. *Ferris v. Polansky,* 191 Md. 79, 59 A. 2d 749 (1948).

Judge Finan, for the Court, has given a comprehensive and helpful review of the law in Maryland and generally in regard to the subjective and objective standards in contracts providing for performance to the "satisfaction" of another person in *First National Realty Corp. v. Warren-Ehret Co., Inc.,* 247 Md. 652, 657-61, 233 A. 2d 811, 813-16 (1967).

If there is ambiguity in the contract in regard to which test applies, the Courts will prefer a construction that the objective test applies inasmuch as this test is more likely to prevent a forfeiture. 3A *Corbin on Contracts* § 644, at p. 81 (1960) ; 1 Restatement, *Contracts* § 265, p. 380 (1932) ; 5 *Williston on Contracts* § 675 A, at p. 207 (3rd ed. 1961). See *Simpson v. Prudential Ins. Co. of America,* 227 Md. 393, 406, 177 A. 2d 417, 425 (1962).

As in *First National Realty,* however, we do not find it necessary to resolve the interesting question in regard to which test applies in that, assuming for the argument that the subjective test applies—as Volos contends—the trial court's conclusion is nevertheless supported by its findings on the facts.

In *Ferris v. Polansky, supra* [191 Md. 79, 59 A. 2d 749 (1948)] in which the subjective test of satisfaction in regard to performance was clearly applicable both by the provisions of the employment contract and by the type of performance itself—playing in a string band—Judge Collins stated, for the Court:

> "In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, *acting in good faith* is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer. It is not necessary that there exist grounds deemed adequate by the trier of facts for the employer's dissatisfaction. He is the judge as to whether the services are satisfactory. *However, this dissatisfaction, to justify the discharge of the employee, must be real and not pretended, capricious, mercenary, or the result of a dishonest design. If the employer feigns dissatisfaction and dismisses the employee, the discharge is wrongful. The employer in exercising the right of dismissal because of dissatisfaction must do so honestly and in good faith.* 35 *American Jurisprudence,* Section 28, pages 463, 464; *Mackenzie v. Minis,* 132 Ga. 323, 63 S. E. 900, 23 L. R. A., N. S., 1083, 16 Ann. Cas. 723; *Fried v. Portis Bros. Hat Co.,* 41 Ga. App. 30, 152 S. E. 151."
> (Emphasis supplied.)
> (191 Md. at 85, 86, 59 A. 2d at 752.)

See also 3A *Corbin on Contracts, supra,* § 647, pages 105-106, where Professor Corbin states:

> "Dismissal is wrongful if it is in fact for rea-

sons other than honest dissatisfaction with the service rendered. Evidence of unreasonableness is admissible on the issue of good faith."

The question of whether the dissatisfaction of Volos was "real and not pretended, capricious or mercenary" is for the trier of fact. If tried before the court without a jury, we will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Maryland Rule 886. *Ferris v. Polansky, supra* [191 Md. 79, 59 A. 2d 749 (1948)]. See 53 Am. Jur. 2d *Master and Servant* § 37, p. 113 and the annotation entitled: "Right to discharge one employee to produce a result of a more or less mechanical nature because his work is not to the 'satisfaction' of the employer as the contract requires." 6 A.L.R. 1497, 1500. See also 56 C.J.S. *Master and Servant* § 32, at pp. 416, 418.

The trial court in its oral opinion relied in part on the decisions of our predecessors in *Board of Street Commissioners of Hagerstown v. Williams*, 96 Md. 232, 53 A. 923 (1903) and *Rogan v. Cook*, 188 Md. 345, 52 A. 2d 625 (1947) in regard to the discharge of public employees "for cause," and was of the opinion that the words "for cause" in the employment contract should have no different meaning in a private contract of employment. The trial court, however, did not confine his opinion to this theory (upon which we express no opinion) in finding that Sotera's employment had been wrongfully terminated. Judge Proctor reviewed at some length the conduct of Flanders, indicating that the purported termination was pretended and capricious, and not real. He stated:

"Flanders knew that the company during the months of January, February and the first eleven days of March had only sold some $15,-000.00 worth of the product. He knew what the condition of the company was, but he was just trying like an ostrich to stick his head in the sand and ignore it. That is borne out by his at-

titude towards Dr. Robinson. He promises Dr. Robinson that he's going to contact him in a day or two, not once but twice, and doesn't do it. He tells Sotera he's going to come up the morning of April 6th so they can sit down and talk about the upcoming stockholders meeting—he doesn't do it. He was told apparently by his own counsel to close up Reine because of the drainage it was on Volos—he doesn't do it. It is my judgment that Sotera in not being at the stockholders meeting exercised good judgment. If he had been there and the questions had been put to him which were put to Flanders and he had given honest answers, there would have been a rebellion at the stockholders meeting. As it was in his actions, Flanders with the assistance of counsel was able to hush up the stockholders and hope for a better day. Flanders was asked by one of the stockholders at that meeting what he intended to do with Sotera—did he intend to fire him for not showing up at the meeting. Flanders said he was considering several alternatives—this is a quotation from the minutes, which is Plaintiff's Exhibit No. 3— 'The Chairman said that he was considering several alternatives, including dismissal, but wanted to reserve an opinion until he had an opportunity to talk with Mr. Sotera and Mr. Biemiller to determine why they were not present.' He knew full well why they weren't there; he didn't have to talk to them. And although a motion was made and seconded to reject the proposed qualified stock option plan which was one of the contract obligations to Sotera, Flanders persuaded the stockholders to authorize the plan; that particular situation being stated as follows: 'If the stockholders were to defeat the plan at this point, Mr. Sotera may very well contend that the Corporation had breached its employment

agreement with him, and he did not want to have to deal with any unnecessary contentions in his expected litigation with Mr. Sotera.' He thereupon recommended the approval of the plan, and it was approved. So that the meeting closed without any indications by Flanders that he was going to fire Sotera forthwith. He had an informal meeting with the directors immediately thereafter, and there was no definite conclusion reached at that meeting. He said that the directors left the decision up to him—and yet at 6:24 p.m., the telegram is sent to Sotera telling him that he is discharged."

It should also be observed that in the telegram of April 6 a *general* reference to paragraph 4 of the Employment Contract of November 22, 1968, is made, *i.e.,* that the termination is "PERSUANT [*sic*] TO PARAGRAPH 4 * * *"; but no specific reason for the termination is given. In reaching his conclusion, Judge Proctor considered "all the circumstances." These circumstances, as we have indicated, support a conclusion that the termination of Sotera's employment was not real, but was capricious action on the part of Flanders.

### 2.

In our opinion, the trial court did not err in holding that Sotera used reasonable diligence in seeking other employment in mitigation of damages after the wrongful termination of his employment by Volos.

This Court considered the applicable law in regard to damages and their mitigation upon wrongful discharge of an employee in *Atholwood Development Co. v. Houston,* 179 Md. 441, 445-47, 19 A. 2d 706, 708-709 (1941). Judge Delaplaine stated, for the Court:

"The measure of damages in an action for wrongful discharge is *prima facie* the employee's salary for the remainder of the period of

employment. But the employer may undertake to mitigate the damages by showing that the employee has earned wages from other employment, or that he could have secured other employment by using proper effort. The general rule is well established in this state that a wrongfully discharged employee is entitled to recover damages to the extent of the stipulated salary for the stipulated period, less the amount he actually earned during the period, or the amount he might have earned after his discharge by the exercise of reasonable diligence in seeking other employment in the same or similar business. *Hamill v. Foute,* 51 Md. 419, 429; *Olmstead v. Bach,* 78 Md. 132, 145, 27 A. 501, 505; *Hippodrome Co. v. Lewis,* 130 Md. 154, 157, 100 A. 78, 80. What constitutes reasonable diligence is a question of fact depending upon the circumstances of each particular case. The manner in which a person of ordinary diligence would presumably act under similar circumstances is the standard by which the court should determine whether this duty was properly performed. *Gillespie v. Ashford,* 125 Iowa 729, 101 N. W. 649. If a discharged employee sits supinely idle with folded hands, he cannot insist upon the full payment of his wages. He should try to diminish the loss resulting from the breach of contract by making such efforts to secure employment as an average person would make at that particular time and place. *Cumberland & Pennsylvania R. R. Co. v. Slack,* 45 Md. 161, 180; *1 Labatt, Master and Servant,* secs. 331, 360, 393, 399."

\* \* \*

"Moreover, a wrongfully discharged employee is entitled to reimbursement for his reasonable and necessary expenses incurred in searching

for other employment. *Rench v. Hayes Equipment Mfg. Co.,* 134 Kan. 865, 8 P. 2d 346."

Sotera testified in regard to his efforts to find employment after his wrongful discharge, primarily in Baltimore where his family was located, but also in New York City. There was no employment available. He and Biemiller later, as we have observed, in April, 1970, formed Cosmetic, Inc. to act as consultant in regard to the drug and cosmetic business, hopefully to make sufficient money to support himself and his family. This effort failed, Sotera losing some $7,000 or $8,000. In his efforts to seek employment, he spent some $1,000. Later Sotera obtained employment in October 1970 with the Joseph Bartolone Agency at his old salary, $25,000 per annum. It is obvious that Sotera did not sit "supinely idle with folded hands." On the contrary, the trial court could find, as it did, that he had actively sought to mitigate the damages.

Indeed, Sotera might well have been entitled to an additional $1,000 for his expenses reasonably incurred in seeking other employment in an effort to mitigate the damages. See *Eastern Advertising Co. v. Shapiro,* 263 Mass. 228, 161 N. E. 240 (1928) ; 5 *Corbin on Contracts, supra,* § 1044, p. 275 and cases collected in note 64, pages 275-77; 1 Restatement, *Contracts, supra,* § 336 (2), pp. 535-36.

Sotera, however, did not file a cross-appeal so that this question is not before us. See *Adams v. Wilson,* 264 Md. 1, 284 A. 2d 434 (1971).

It should be observed also that the "burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract." 5 *Corbin on Contracts, supra,* § 1039, at p. 251. The substantial weight of authority supports this statement. See *Apex Mining Co. v. Chicago Copper & Chemical Co.,* 340 F. 2d 985 (8th Cir. 1965) and the many other cases collected in note 22 in § 1039, p. 251.

Here again, we cannot say that the lower court's findings of fact on this issue were clearly erroneous, Rule 886, or that his conclusion was in error.

> *Judgment affirmed, the appellant to pay the costs.*

DIGGES, J., dissenting:

Reluctantly, I find myself compelled to enter a dissent from the majority opinion. I do this for two reasons: i. Sotera, the executive vice-president and chief operating officer of Volos, did not establish that his dismissal by the chairman of the board, Flanders, was pretended, capricious or mercenary; and ii. appellee did not prove that he was entitled to the damages which were awarded.

I do not quarrel with the basic legal principles that the majority has utilized, nor generally with the correctness of the statement of facts as set forth in their opinion; instead my divergence is with the application of those facts to the law. It is not necessary to repeat the factual pattern but rather I will briefly focus on the pertinent details of the dispute, all of which revolve around what occurred on April 6, 1970. Immediately prior to that date Sotera, upon returning from a short vacation, made an appointment to see Flanders on Monday morning, April 6, to discuss the corporation's financial status as well as Volos' annual stockholders' meeting scheduled for that afternoon. Flanders did not keep this appointment but around noon phoned the appellee and instructed him to attend the shareholders' meeting. Sotera verified this communication at the trial.

> "Q. Did he [Flanders] tell you to be present at the stockholders' meeting?
> A. He *commanded* that I be present . . ." (emphasis added).

Appellee failed to attend this meeting but rationalized his absence when he testified:

> "The reason that I did not appear at the annual

meeting was really a culmination of many things that had taken place over the past two or three months, and I felt as though it would be to the detriment of the company if I were not prepared to answer questions which might be raised from the floor.

. . .

Q. What questions, in particular?
A. As to the financial condition of the company; as to the future of the company; as to the position of our subsidiary Reine; as to the position of our future, period."

Sotera agrees that he was directed to attend the meeting so he could answer shareholder inquiries and he does not contend that his boss had suggested that these responses should be untruthful or evasive. At the meeting itself the chairman was closely questioned about the absence of the general manager, Sotera. The minutes relate the following:

"Another stockholder inquired as to why Mr. Sotera and Mr. Biemiller [corporation treasurer] were not present at the annual meeting of stockholders. The Chairman stated that he had directed them to be present, as he was leaving his office, by telephone, but when he arrived at the Company's offices, neither Mr. Sotera nor Mr. Biemiller were present. Upon investigation, he found they had advised the staff that they would not return until the following morning. Another stockholder inquired as to what, if any, action the Chairman proposed to take as a result of the unauthorized absence of the executive vice president and treasurer of the Corporation. The Chairman said that he was considering several alternatives, *including dismissal,* but wanted to reserve an opinion until he had an opportunity to talk with Mr. Sotera and Mr.

Biemiller *to determine why they were not pres-ent."* (Emphasis added.)

That evening Flanders sent a telegram to Sotera which terminated his position with Volos "for cause" under paragraph 4 of appellee's employment contract (set out in the majority opinion).

The real issue here is whether the dismissal of appellee, the operating head of Volos, resulted from Flanders' honest dissatisfaction with the general manager or if the discharge was "capricious, mercenary, or the result of a dishonest design." *Ferris v. Polansky,* 191 Md. 79, 59 A. 2d 749 (1948). The pertinent law with which the majority apparently agrees, was well set out by Chief Judge Brune for the Court in *Stamatiades v. Merit Music,* 210 Md. 597, 614, 124 A. 2d 829 (1956). He said:

> "Though much is left to the discretion of the party to whom the thing or service must be satisfactory, and the judgment of a court is not to be substituted for the honest, even though *misguided,* judgment of the party, his judgment must be exercised honestly and in good faith." (Emphasis added.)

Using this as a rationale the majority, in their opinion, stated that the "question of whether the dissatisfaction of Volos was 'real and not pretended, capricious or mercenary' is for the trier of fact. If tried before the court without a jury, we will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Maryland Rule 886." The implication here is that this always is a question to be decided by the trier of fact. I am of a contrary view. Even assuming these questions may normally be ascertained by the trier of fact, once the facts are undisputed or if reasonable minds would not differ in the determination of the issues, then the propriety of the dismissal becomes a matter of law. In the case here, it is conceded that Sotera was "commanded" to attend the shareholders' meeting. That being true, no issue on

this point was presented for the trial judge to decide. But the majority may contend that even though there was no factual dispute, Judge Proctor still had the obligation, as trier of fact, to determine whether the dismissal was "capricious, mercenary, or the result of a dishonest design," in light of appellee's failure to appear. *Ferris v. Polansky, supra.* However, I am persuaded that if reasonable minds would not differ about the result, then likewise this becomes a matter of law. And here it cannot properly be argued that reasonable minds would differ on the conclusion that the chief operating officer's unexcused and arrogant absence from the annual stockholders' meeting did not justify his swift dismissal by Flanders.

In contrast the trial judge's opinion, which my colleagues now approve, said:

> "It is my judgment that Sotera in not being at the stockholders meeting *exercised good judgment.* If he had been there and the questions had been put to him which were put to Flanders and *he had given honest answers, there would have been a rebellion* at the stockholders meeting. As it was in his actions, Flanders with the assistance of counsel was able to hush up the stockholders and hope for a better day." (Emphasis added.)

This statement is both distressing and ill conceived. The purpose of shareholder meetings is not to present a facade of good health which hides a cancerous disease and the courts should not perpetuate such deceitful acts. Indeed, a major purpose of these meetings should be to present the real owners of the business with an accurate picture of the corporation in both its successes and failures, so that matters requiring their consideration can be intelligently decided. It is definitely my feeling that Sotera, by failing to attend this meeting, to say the least, *exercised bad judgment.* If the company was in serious financial straits then it was his duty as general manager

and executive vice president to so inform the shareholders. While upheavals may generally be frowned upon there is no merit to the trial judge's conclusion that Sotera's absence prevented a rebellion. Rather his absence obstructed the stockholders from obtaining the knowledge, to which they were entitled, of Volos' dire economic problems; in fact, the minutes of the meeting record their dissatisfaction with the information they received. One does not cure a malady by failing to recognize its existence. The best cure would seem to be full disclosure of all symptoms as well as the possible corrective action necessary for recovery. If Sotera's presence at the meeting would have precipitated unrest, so be it. Unrest is certainly preferable to ignorance which could ultimately lead to the company's demise.

Given this employment contract in which Sotera is subject to the direction of Flanders and which permits dismissal "for cause," the conceded failure of the chief operating officer to attend the annual stockholders' meeting, as was expressly required, constituted insubordination of such magnitude that reasonable minds would not differ in concluding that the firing was justified. If this refusal to attend the meeting be insufficient cause for terminating Sotera's employment, then I cannot conceive of any failure by an employee to carry out his employer's directives as warranting dismissal.

My second divergence with the majority is whether Sotera has proved that he is entitled to the damages which were awarded. My colleagues quote *Atholwood Development Co. v. Houston,* 179 Md. 441, 445-47, 19 A. 2d 706, 708-09 (1941) for the controlling law. In that case the Court said:

> "The measure of damages in an action for wrongful discharge is *prima facie* the employee's salary for the remainder of the period of employment. But the employer may undertake to mitigate the damages by showing that the employee has earned wages from other employ-

ment, or that he could have secured other employment by using proper effort. The general rule is well established in this state that a wrongfully discharged employee is entitled to recover damages to the extent of the stipulated salary for the stipulated period, less the amount he actually earned during the period, or the amount he might have earned after his discharge by the exercise of reasonable diligence in seeking other employment in the same or similar business. What constitutes reasonable diligence is a question of fact depending upon the circumstances of each particular case. The manner in which a person of ordinary diligence would presumably act under similar circumstances is the standard by which the court should determine whether this duty was properly performed. If a discharged employee sits supinely idle with folded hands, he cannot insist upon the full payment of his wages. He should try to diminish the loss resulting from the breach of contract by making such efforts to secure employment as an average person would make at that particular time and place." (Citations omitted.)

I totally agree with this statement but I differ in applying the admitted facts to this law. When Sotera was fired on April 6, 1970, he and Biemiller waited less than two weeks before they organized Cosmetic, Inc., through which they acted as consultants for pharmaceutical manufacturers. This business venture failed several months later with Sotera losing $7,000 or $8,000 and thereafter he promptly accepted a salaried job in New York.

Appellee emphasizes that he was unable to find employment in the interval between his dismissal from Volos and the formation of Cosmetic, Inc. However, it certainly cannot be claimed that his failure to find employment in these scant few days demonstrated sufficient effort which justified the cessation of the search.

Instead it is my view that Sotera thought he could succeed in this new company and devoted his time to this pursuit; but to no avail. What the trial court permitted and the majority affirmed was the tenuous concept that Volos should become an insurer against the failure of Sotera's new enterprise. In this case, appellee is given the incredible option of going into business for himself and when unsuccessful, being allowed to recover damages based on his original dismissal. It is my conclusion that from the time Sotera formed Cosmetic, Inc. and expended his energies on this consulting firm, Volos ceased to be responsible for any further damages. The language of Chief Judge Cardozo speaking for ·the Court of Appeals of New York in *McClelland v. Climax Hosiery Mills,* 169 N. E. 605, 252 N. Y. 347 (1930) is apposite here.

> "The statement is made not infrequently, in treatise and decision, that a servant wrongfully discharged is 'under a duty' to the master to reduce the damages if he can. The phrase is accurate enough for most purposes, yet susceptible of misunderstanding if emphasized too sharply. American Law Inst. *Restatement of the Law of Contracts,* § 336. The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this, that, if he unreasonably rejects, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has *broken the chain of causation;* and loss resulting to him thereafter is suffered through his own act. It is not damage that has been caused by the wrongful act of the employer." (Emphasis added.)

In this case appellee broke "the chain of causation" when he began the operation of Cosmetic, Inc. The fact that Sotera did not actually diminish his damages because of a poor business venture does not affect Volos' liability;

appellant should not under these circumstances be the guarantor of Sotera's prosperity.

I would reverse the judgment of the trial court.