Charles M. MILLER

v.

The UNITED STATES.

No. 66–75.

United States Claims Court.

Oct. 19, 1982.

H. Clay Robinson, Fort Smith, Ark., attorney of record, for plaintiff. Pryor, Robinson, Taylor & Barry, Fort Smith, Ark., of counsel.

John E. Lindskold, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge:

Plaintiff in this case has alleged a "taking" by the Government of a flowage and underflowage easement on farm property riparian to the Arkansas River in Perry County, Arkansas. Plaintiff's complaint is that his land suffers increased flooding and duration of flooding as a result of the operation of the McClellan-Kerr Arkansas River Navigation System. He further maintains that the project has raised the ground water table under his land and that he is consequently unable to machine farm parts of the land.

A trial was held on the issue of liability and I concluded that defendant's actions resulted in a compensable "taking" under the fifth amendment. On June 14, 1978, a recommended decision and findings of fact were submitted to the court to that effect.

In response to exceptions by defendant, the court, by order of November 21, 1979, remanded the case back to the trial division for additional findings of fact on specific questions which the court deemed necessary for a determination of the case.

Following the remand and pursuant to order, a pretrial conference was held to determine if a trial would be necessary to answer the court's questions. As a result of the conference, the parties stipulated responses to questions 1–4 of the November 21st order. These stipulations were contained in a "Memorandum Re Pretrial Conference," dated April 7, 1981. Thereafter, in a further effort to respond to additional questions, the parties stipulated answers to the court's questions (a), (b) and (c). The stipulation regarding the latter questions was accepted on August 19, 1981, in open court.

One question of fact remained to which the parties were unable to stipulate an answer. Thus, on August 19, 1981, a trial was held in Little Rock, Arkansas, to hear testimony and receive exhibits on this final issue.

When this case was remanded, it was deemed to have been remanded for a resolution of only those specific factual questions detailed in the court's order of November 21, 1979. Accordingly, no additional recommended opinion was to have been proposed to the court by the trial judge. However, with the implementation of the Federal Courts Improvement Act of 1982 and the resulting dissolution of the Court of Claims and the creation of the new Claims Court, this has changed.

As of October 1, 1982, the trial division of the Court of Claims became the United States Claims Court. With this change, the new Claims Court judges were charged with the responsibility of reaching final decisions in cases brought before the court. The former Court of Claims judges have become appellate judges of the new Court of Appeals for the Federal Circuit, and their duties include hearing appeals from final judgments rendered by the Claims Court. Because of these changes, it is incumbent upon me to do more than simply refer the findings of fact and conclusions of law to the new appellate court in answer to the particular questions included in the remand order from the former Court of Claims judges; I must now reach a decision as to the issues not already resolved and render a final judgment in this case.

Therefore, based on a review of the entire record, including the conclusions of law contained in the remand order, the stipulations of the parties, and the additional evidence received at trial, I have concluded that there has been no taking in this case, and that plaintiff is thus not entitled to compensation for the flooding of his property.

## Background

A portion of the facts contained in the June 14, 1978, opinion, useful to the understanding of the decision on remand, are set forth here again as background.

Plaintiff, in 1936, became the owner of a 1,834-acre tract of land in Perry County, Arkansas. This tract (hereinafter, the "property") was at one time located within a northward loop of the Arkansas River. The Arkansas River was highly unstable in its natural state. Because of its heavy sediment load, it presented serious impediments to navigation. The river could overnight change from a mere trickle of water to a rushing torrent, change its course, and destroy improvements along its banks.

During the late forties, erosion transformed plaintiff's property into a peninsula delimited by a "horseshoe" bend of the Arkansas, and reduced his acreage to between one-third and one-half of its original size. The Corps of Engineers (hereinafter the "Corps") became concerned, as they expected that the river would soon cut itself a new channel across the neck of the peninsula. Such a natural "avulsive change" would have been a serious setback to river navigation, as the new channel would probably contain sharp, difficult-to-navigate bends. The United States therefore acquired 248 acres from plaintiff for $34,000 and planned the construction on this acreage of a new, easily navigable channel for the river (hereinafter the "Morrilton Cutoff" or "Cutoff").

In May 1950 the Corps constructed a pilot channel across the neck of the ox bow. The abrasive action of the river soon widened the channel to the desired extent, and its northern bank was stabilized by the Corps in 1952 by the construction of a suitable revetment. The new channel captured most of the flows of the Arkansas. As a result of water flowing through the old channel at lesser velocities, sediment was deposited. The silting-up of the ox bow was accelerated by the Corps' construction of two dikes at the upstream end of the old channel in 1952 to divert flows away from the old riverbed. The old channel became an ox bow lake, a nonnavigable tributary of the Arkansas. Eventually the plaintiff sought and obtained title to the emerged lands, and began to farm them. Of the 1,719 acres currently comprising the Miller farm or property, approximately 800 acres lie on the pre-cutoff bed of the Arkansas River.

In 1956 the Corps began the construction of the McClellan-Kerr Arkansas River Navigation Project, authorized by Congress back in 1946.[1] Seven tributary lakes were to be converted into multiple-purpose reservoirs for low-flow regulation, sediment control, flood control, domestic and industrial water supply, and hydroelectric power. In addition, the main stem of the river was to be "canalized" by 17 navigation locks and dams. (When completed, the project was to provide a 448-mile long navigational channel from around Tulsa, Oklahoma, to the Mississippi River.) By 1964 the last of the upstream flood control reservoirs had been readied for flood control operation, the primary object of the authorizing legislation. The canalization plan was changed many times as the Corps found ways of simplifying the system. In 1960 or shortly thereafter, it was decided that the Toad Suck Ferry Lock and Dam No. 8 would be located 9½ miles downstream from plaintiff's property, and that the elevation of its upstream navigation pool would be fixed at 265 ft. The property is riparian to this pool. In 1965 wing dikes were constructed downstream of the property, and in 1969 the downstream Dam No. 8 was closed.

Plaintiff alleged in his complaint that the closing of the dam resulted in greater flooding to his land and that the operation of flood control reservoirs caused increased duration of flooding on the property. He also complained that he is unable to farm his crops with heavy machinery because the project has raised the water table under the farm. I originally found that there was a substantial interference with plaintiff's use of his land as a result of the project and that the portions of the property so affected were not servient to any flowage easement defendant had over plaintiff's land. I therefore concluded that there was a "taking" and that plaintiff was entitled to compensation, but since—

> [T]he testimony of record does not show which acres of the property are affected—either in terms of direct crop damage or in terms of "noncombinability"—plaintiff will have to present appropriate proofs during the accounting phase.[2]

Although defendant maintained that the Government held a navigation servitude over the property within the former bed of the Arkansas, it was never made entirely clear that all the "land in controversy" was part of this riverbed. Defendant's rationale is further grounded in the common law doctrines of "avulsion" and "accretion." Accretion is the process by which deposits of soil are gradually added to one's land by the operation of natural causes. Avulsion is the sudden addition or loss to land due to a radical change in the course of a river or stream.

█ In the former instance, common law recognizes that property lines measured by the water will change gradually with the migration of the river or stream. However, with avulsion, the law acknowledges the drastic impact of the boundary change to the landowner and does not in that case shift property title with the shift in the water's course. Thus, the avulsion doctrine mitigates the hardship that the sudden

---

1. Flood Control Act of July 24, 1946, 60 Stat. 641.

2. *Miller v. United States*, Ct.Cl. Trial Div., No. 66–75, Opinion of June 14, 1978, at 31.

movement of a river or stream would have on the abutting landowner. *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 327, 94 S.Ct. 517, 526, 38 L.Ed.2d 526 (1973).

Defendant maintained that the creation of the cutoff was an artificial avulsion and that the property interest held by the Government, that is, the navigation servitude, did not shift with the river. The court on remand allowed that the former riverbed might still be subject to a servitude even though it was no longer a navigable waterway, but focused on the *Bonelli* requirement that there must exist a navigation purpose to retain an interest in the exposed land.

Defendant also insisted that benefits to plaintiff's property had to be taken into account in deciding if there had been a taking. Plaintiff claimed that benefits from the project had already been considered either in the bargaining that occurred in the negotiation of the 1950 sale of land to defendant or as an element of compensation for acreage condemned in 1969–70. It was determined in the recommended opinion that there was a presumption that these benefits were considered in the context of the negotiated sale in 1950, and that this presumption had not been rebutted. Further, it was determined that there was an irrebuttable presumption that benefits were considered in the 1970 condemnation proceedings, based on the directives of 33 U.S.C. § 595 (1970). This section of the code required that the Government "take into consideration by way of reducing the amount of compensation or damages any special or direct benefits to the remainder" arising from Government projects.

The conclusion was that benefits from the 1950 Morrilton Cutoff could not be weighed again in determining plaintiff's recovery from lands taken. The court on remand disagreed with the conclusion that the consideration of benefits was decided by presumption, and directed that further factfinding be done on this issue.

### Discussion

■ The decision I come to in this case incorporates the legal conclusions articulat-

ed by the court in its remand order. Thus, the Government did not necessarily lose its navigation servitude over surfaced lands within the boundaries of the former bed of the Arkansas River, up to its mean high water level, when the channel became nonnavigable. Whether the Government continues to hold the navigation servitude depends on whether the emerged lands are needed for the continued operation of the navigation project which caused the resurfacing of the land. This conclusion is in keeping with the decision reached in *Bonelli Cattle Co. v. Arizona, supra,* 414 U.S. at 329, 94 S.Ct. at 527.

The facts of the *Bonelli* case are similar to those in the instant case. Plaintiff Bonelli acquired title to a parcel of land abutting the east boundary of the Colorado River. The land was originally granted by patent to the Santa Fe Pacific Railroad Company in 1910. In 1912, upon admission to the Union, Arizona succeeded the Federal Government to title of the Colorado River bed. Over the years, the river moved eastward, resulting in the submergence of plaintiff's land. In 1959, the Federal Government rechannelled the river, causing the water of the river to withdraw from much of plaintiff's land.

Plaintiff brought suit to quiet title to the emerged land, but the State of Arizona maintained that the title to the former riverbed remained with it. The Supreme Court disagreed. It held that since there was no longer any public need for the land, the state's title was defeasible, since public need for the land was the basis for vesting title with the state in the first place. The court found that where—

> [L]and cast up in the Federal Government's exercise of the servitude is not related to furthering the navigational or related public interests, the accretion doctrine should provide a disposition of the land as between the riparian owner and the state.

*Id.* at 329, 94 S.Ct. at 527.

Similarly, the court held, riparian lands may suffer noncompensable losses in the exercise of the Government's navigational servitude. *Id.*

■ Thus, the facts in the instant case must be reviewed in the context of the *Bonelli* holding. Question 2 of the remand order focused on this point. The court asked:

> 2. It is undisputed that at least part of the land in issue emerged from the bed of the river after the cutoff, but there is a dispute as to whether the surfaced lands, which are the subject of plaintiff's claim, are necessary to the continued operation of defendant's "navigational project or its purpose." *See Bonelli Land and Cattle Co. v. Arizona,* 414 U.S. 313, 329, 94 S.Ct. 517, 527, 38 L.Ed.2d 526 (1973).

The parties stipulated the following response: "It is necessary to flood the 'lands in controversy' to permit navigation on the Arkansas River."

Thus, the plaintiff conceded that the flooding of the former riverbed portion of his land is necessary for the navigation project. In view of the parties' stipulated response, the next question which must be addressed is whether any of the "lands in controversy" are subject to a navigation servitude. This issue is treated by question 1 of the order:

> 1. Although it is well settled that the Government's navigation servitude extends to all submerged property within the bed of a navigable river from ordinary high-water mark on one side to ordinary high-water mark on the other, there is a factual dispute as to how much of the land in controversy was located above the ordinary high-water mark of the river prior to the construction of the 1950 cutoff. How much of that land is located within the area of the former bed of the river and how much outside the former bed?

The stipulated answer to this question was as follows:

> Plaintiff will accept the Government's survey that *all* "lands in controversy" are

situated within the area of the former riverbed as it existed prior to the construction of the 1950 cutoff for purposes of determining whether a taking occurred.

Looking at these stipulated responses in light of the *Bonelli* case, I find that they are dispositive of this case. Since all of the land in controversy is within the former riverbed, and the flooding of the land is necessary to the navigation project which caused the emergence of the land initially, then the Government has a navigational servitude over all of the land in controversy. Therefore, there has been no taking under the fifth amendment.

■ Having concluded that there has been no taking, it becomes unnecessary to consider the additional questions posed by the court on remand.[3]

## CONCLUSION

Based on the foregoing, the court concludes as a matter of law that plaintiff is not entitled to compensation for the flooding of his property, within the former riverbed of the Arkansas River, which is necessary to the continued operation of defendant's navigation project, and the petition is dismissed.

---

**3.** These questions, which except for question (d), are the subject of the parties' stipulations, go to the issue of whether benefits to plaintiff's land were considered in connection with compensation paid to plaintiff for an easement in 1968. The discussion of benefits would only be relevant if part of the land interfered with by the Government were outside the former riv-

erbed for it would then become necessary to determine compensation for the taking. In such a case, the Government would be entitled to offset benefits to the land resulting from its project against any detriment to the property to see if a taking has occurred. *See United States v. Sponenbarger,* 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939).