**INTERSTATE COATINGS, INC.**

**v.**

**The UNITED STATES.**

**No. 34–84C.**

United States Claims Court.

Jan. 14, 1985.

Daniel C. Jacobson, Seattle, Wash., for plaintiff.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

OPINION

MARGOLIS, Judge.

The plaintiff, a government contractor, brought this action for breach of warranty

and breach of contract because a supplier specified by the Government failed to deliver material in time for the plaintiff to complete the contract under its own schedule, though the supplier did deliver the material within the time allowed by the contract. The parties have cross moved for summary judgment. After considering the entire record and hearing oral argument, this Court denies the plaintiff's motion and grants the defendant's motion.

## FACTS

The parties do not contest the following facts:

On or about February 1, 1979 the Bureau of Reclamation of the United States Department of the Interior [Bureau] issued Solicitation No. 10–C0072. The solicitation invited bidders to sandblast and paint the downstream surfaces of ten drumgates in the spillway of Grand Coulee Dam in the State of Washington. The contractor could work for only nine or ten weeks a year, between late March and early June, when the lake behind the dam was below 1258 feet. When the water rises above 1258 feet, the Bureau opens the drumgates to draw down the water level. The gates cannot be painted when they are open.

The solicitation required the contractor to complete work within 180 days after receiving notice to proceed. The plaintiff, Interstate Coatings, Inc., [Interstate] determined that it could finish painting the drumgates during the 1979 season by working six ten-hour days per week or by double shifting. But the Bureau later decided that bidders would not have time enough to finish during one low water period. On February 28, 1979 it issued Supplemental Notice No. 2, which extended the completion date to June 15, 1980.

The plaintiff acknowledged receipt of Supplemental Notice No. 2 when it submitted its bid on March 6, 1979. The plaintiff still believed that it could finish the project, and finish it more efficiently, in one season rather than in two. By completing the contract in one season, Interstate could avoid a second mobilization of

forces, the higher labor rates scheduled for 1980, extra *per diem* expenses to maintain its forces at the remote job site, another year's overhead at the job site and at the home office, and extra bond premiums. The plaintiff reckoned that the Government specified manufacturer could supply enough paint to finish the job in one season. *See* Affidavit of Donald R. Sybil at 4–5 (October 12, 1984). The Bureau awarded Contract No. 9–07–10–C0072 to the plaintiff on March 28, 1979.

The contract required Interstate to prime the sandblasted drumgates "with a two-part Polyvinyl Polyurethane High Performance Primer 301 manufactured by United Paints Company, Spokane, Washington." Interstate was to coat the primed surfaces "with a liquid abrasion resistant Polyurethane Rubber, trade name Elastuff 504," manufactured by the same company. U.S. Department of the Interior, Bureau of Reclamation, Solicitation No. 10–C0072, Specifications § 2.1.2(c) [Specifications].

When it learned that it was the low bidder, Interstate ordered enough Primer 301 and Elastuff 504 to complete the work. On March 30, 1979, the manufacturer responded: "Due to a severe raw material shortage, United Paint Mfg., will be able to supply 1200 gallons of Elastuff 504 on April 6.... The remaining 2100 gallons will be available the first week of July 1979"—too late to apply during the 1979 low water season.

Sometime in April 1979, Interstate sent the Bureau a sample of paint that Interstate believed to be the equivalent of Elastuff 504. The manufacturer, Gaco Western, Inc., could have supplied the paint in time for use during the 1979 season. *See* Letter of Gaco Western, Inc. to Interstate Coatings, Inc. (March 30, 1979). On May 4, 1979 the Contracting Officer's representative responded to Interstate's suggestion: "We have examined the samples and data for the Gayco [*sic*] product which you hand carried to us. The product does not appear to us to have the abrasion resistance qualities that the United Paint Company product does. Therefore we cannot approve it for

use on the drumgates." Interstate stopped work on May 4, 1979 on the grounds that it had no more Elastuff 504 and was not permitted to use an equivalent product.

Interstate remobilized its forces at the dam on March 24, 1980 and nearly completed the contract during the 1980 season. The Bureau deleted all remaining work. The parties settled some of Interstate's claims in January of 1982. Interstate certified and submitted its remaining claims to the Contracting Officer, who denied them on August 3, 1983. Interstate filed its complaint here on January 26, 1984, seeking an equitable adjustment of $64,300 plus interest and attorney's fees.

## DISCUSSION

The plaintiff argues that the Bureau: A) implicitly warranted that United Paint could supply enough Elastuff 504 to finish the job; and B) breached its contractual duty to evaluate and approve an equivalent product. The defendant argues that the plaintiff has failed to state a claim on which relief can be granted.

### A. *The Plaintiff's Motion: Breach of Warranty*

▇ The plaintiff contends that the Government warranted the commercial availability of Elastuff 504 when it specified United Paint as the sole supplier. According to the plaintiff, the Government also implicitly guaranteed that United Paint could make all necessary deliveries within one season, even though the contract allowed for two seasons of work. The Court disagrees. When the Government lists suppliers,

> one could readily accept the proposition that such a listing constitutes a representation, *i.e.*, a warranty by the Government, that the listed suppliers have the *ability* to do the work contemplated by the contract. Indeed, the *common sense* of the situation could tolerate no less a construction of such contract statements. But it is quite another matter to say, as the plaintiff also does, that in addition to guaranteeing the abilities of the listed

manufacturers to perform, the Government is also warranting their willingness to do so and within the time period contemplated by the contract.

*Franklin E. Penny Co. v. United States*, 207 Ct.Cl. 842, 853–54, 524 F.2d 668, 674–75 (1975) (emphasis in the original). If the Government does not warrant that a designated supplier will perform within the period set by the contract, as the U.S. Court of Claims implied, then *a fortiori* the Government does not warrant that a supplier will perform in a shorter time.

In this case the parties agree that United Paint delivered all necessary supplies in time for the plaintiff to finish the job by the contract deadline. The Government breached no warranty. *Cf. Aerodex, Inc. v. United States*, 189 Ct.Cl. 344, 417 F.2d 1361 (1969) (Government did breach warranty when specified sole supplier refused to sell the required component.).

### B. *The Plaintiff's Motion: Breach of Contract*

The contract provides:

> Unless otherwise specifically provided in this contract, reference to any equipment, material, article, or patented process, by trade name, make or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition, and the Contractor may, at his option, use any equipment, material, article, or process, which, in the judgment of the Contracting Officer, is equal to that named. The Contractor shall furnish to the Contracting Officer for his approval the name of the manufacturer, the model number, and other identifying data and information respecting the performance, capacity, nature, and rating of the machinery and mechanical and other equipment which the Contractor contemplates incorporating in the work.

GSA Standard Form 23–A, § 9(a), *set out at* 41 C.F.R. § 1–16.901–23A (1979). The contract specifications add: "[W]here because of Government priorities or other causes, materials required by the specifica-

tions become unavailable, substitute materials may be used: Provided, That no substitute materials shall be used without prior written approval of the contracting officer...." Specifications § 1.4.1(a).

The U.S. Court of Claims held that such language obligates a contracting officer to exercise his judgment to determine if a proposed substitute is equal in quality and performance to the proprietary product designated in the contract. *Jack Stone Company, Inc. v. United States,* 170 Ct.Cl. 281, 287–88, 344 F.2d 370, 374 (1965). *See also W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 672, 376 F.2d 299, 313 (1967) (Contracting Officer must exercise his discretion reasonably and fairly.).

In this case, the Contracting Officer's representative, R.J. Mueller, wrote to the plaintiff, "We have examined the samples and data for the Gayco [*sic*] product which you hand carried to us." But at his deposition, Mr. Mueller stated: 1) that he did not test the Gaco paint himself; 2) that he did not know who recommended rejecting the substitute; and 3) that he did not know who analyzed the sample. Deposition of Robert Mueller at 10–11 (June 26, 1984). None of the deposed Bureau employees could recall testing the Gaco paint.

Robert J. Bute, the Bureau engineer who had approved Elastuff 504, testified: 1) that he would have made a record if anyone had asked him to test the Gaco paint; 2) that he would have sent the paint to the Bureau's Denver office for analysis and would have made a record of the submittal; 3) that he had just searched his files and could find no such records; 4) that, so far as he knew, no other employee of the Construction Division had as much experience in painting drumgates as he did; and 5) that the Construction Division would have relied on him to test the Gaco paint. Deposition of Robert Bute at 34–35 (June 27, 1984).

These depositions contradict Mr. Mueller's letter and raise a genuine issue of material fact. The Government may have breached its contractual duty to examine the Gaco paint.

### C. *The Defendant's Motion*

■ This question of fact would normally prevent the Court from granting summary judgment for the defendant. *See* RUSCC 56(c). But in this case, even if the defendant breached the contract, the breach did not harm the plaintiff. Interstate sent the Gaco sample to the Bureau in April. *See* Letter of Donald Sybil to the Bureau of Reclamation (April 18, 1979). The water at the dam rose over 1258 feet on May 26, 1979. U.S. Department of the Interior, Bureau of Reclamation, Grand Coulee Dam River Data at 5 (1979). The Bureau therefore had just over a month during the 1979 low water season to test the paint.

Mr. Bute, however, testified that he had evaluated Elastuff 504 for five to six years and would need at least twelve to eighteen months to test the Gaco paint. Bute Deposition at 32–33. Documentary evidence supports his testimony. *See* Memorandum of R.J. Bute to Head, Civil Engineering (January 16, 1974) (describing machine tests of Elastuff 504 and recommending application to drumgates for a year long test). The plaintiff had an opportunity to cross-examine Mr. Bute but did not question his estimate of the time needed for a test. *See* Deposition at 34–35. The plaintiff has even admitted "[t]he fact that an evaluation may have taken longer than a 4-week period," though it considers this fact "immaterial." Plaintiff's Cross Motion for Summary Judgment at 27.

■ In sum, even if the Bureau had begun testing the Gaco paint immediately, Interstate could not have used it during the 1979 season. The Bureau's failure to test the paint therefore caused no harm. It is true that "[a]n unexcused failure to perform a contract is a legal wrong. Action will lie for the breach although it causes no injury. Nominal damages are then awarded." S. Williston, *A Treatise on the Law of Contracts* § 1339A (3d Ed.1968). *Accord Restatement (Second) of Contracts* § 346(2) (1981). But this Court cannot award nominal damages. *See, e.g., Grant*

v. *United States,* 74 U.S. (7 Wall.) 331, 338, 19 L.Ed. 194 (1869). *See also King v. United States,* 182 Ct.Cl. 631, 636 n. 7, 390 F.2d 894, 898 n. 7 (1968) (list and discussion of cases), *rev'd on other grounds* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). This Court therefore grants the defendant's motion for summary judgment.

### CONCLUSION

Drawing from the record every inference in the plaintiff's favor, this Court could award the plaintiff only nominal damages, a remedy beyond the Court's authority. The plaintiff has therefore failed to state a claim upon which relief can be granted. The Court denies the plaintiff's motion for summary judgment and grants the defendant's motion for summary judgment.[*]

The Clerk will dismiss the complaint.

[*] At oral argument the plaintiff's attorney urged the Court to consider *Gardner Displays Co. v. United States,* 171 Ct.Cl. 497, 346 F.2d 585 (1965). In *Gardner* the court held the Government liable for increased costs incurred before the contract deadline because the contractor could have finished sooner than the contract required, but was prevented by the Government "through no fault of an intervening or independent third party." *Id.* at 503, 346 F.2d at 588. In our case, however, the delay is attributable to United Paint, not to any agent of the Government. As discussed above, the Government's failure to test the paint did not delay Interstate from finishing the contract sooner than required.