**EDWARD M. CROUGH, INC., Petitioner,**

v.

**DEPARTMENT OF GENERAL SERVICES OF the DISTRICT OF COLUMBIA, Respondent.**

No. 88–1328.

District of Columbia Court of Appeals.

Argued Feb. 26, 1990.
Decided April 5, 1990.

Herman M. Braude, Washington, D.C., for petitioner.

Martin B. White, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before NEWMAN, FERREN and STEADMAN, Associate Judges.

NEWMAN, Associate Judge:

Edward M. Crough, Inc. ("Crough"), a general contractor, appeals from a decision by the Contract Appeals Board (the "Board") of the Department of General Services of the District of Columbia, charging that the Board erred, *inter alia*, in denying Crough's claim that the District breached its warranty of commercial availability of certain products. We affirm the decision of the Board.

I

In 1973, Crough was awarded a contract to build an elementary school at Fort Lincoln New Town, N.E. for $6,207,000. The contract called for the roof areas covering the swimming pool and gymnasium to be constructed so that they could serve as play areas. These roof areas were to be built of five layers of material atop a concrete slab. The layers were to be as follows: (1) rigid, one-inch thick insulation boards; (2) bituminous concrete fill, sloping in thickness from a depth of four-inches by one-inch; (3) a waterproof membrane consisting of four-ply cotton with binder; (4) a one quarter-inch thick mastic leveling course; and (5) a wearing surface of pigmented asphalt.

The contract contained three requirements concerning the roof play areas having significance in this appeal. First, the contract required that the three top layers—water-proof membrane, mastic leveling course, and pigmented asphalt wearing surface—be made of specified materials; these specified materials were available only from one local source, Teniseal, Inc. ("Teniseal"). Second, the contract required that the manufacturer of the top three layers provide a five year replacement guarantee for any defective work that developed. Third, the contract required that the waterproof membrane be installed im-

mediately after the installation of the bituminous concrete fill.[1]

Teniseal provided the only bid for the roof play areas, and Crough awarded the work to Teniseal under a subcontract priced at $15,600. The District's pre-bid estimate for the work covered by this subcontract was $117,975.00.

When it came time for Teniseal to perform, Teniseal refused to provide the five-year guarantee required by the contract, because, in its view, the base upon which its product would sit was too soft. The District was notified and a meeting was held between the District, Crough, and Fry & Welch Associates ("Fry & Welch"), the project's architect-engineer, on April 11 and 12, 1974, to resolve the problem. On April 15, Fry & Welch recommended changes in the roofing materials to strengthen the base. The District adopted these recommendations and directed Fry & Welch to proceed with drawings and new specifications. These changes were issued in Basic Change Document ("BCD") No. 19 on August 14, 1974, which directed Crough to (1) eliminate the one-inch thick rigid insulation; (2) increase by one inch the layer of bituminous concrete fill; and (3) increase the one-quarter inch mastic leveling course to one inch. Teniseal responded to the new specification in BCD 19 by agreeing to issue the five-year guarantee required by the contract.

One of Crough's subcontractors installed the thicker layer of bituminous concrete fill in October 1974. As noted above, contract specifications called for the immediate installation of the four-ply cotton waterproof membrane over the fill. However, Crough did not install the waterproof membrane, and the bituminous fill was left exposed to the elements for one year. The bituminous fill deteriorated, and, as a result, there was leakage and water damage to previously installed electrical and mechanical components in the interior of the building.

The reason for Crough's failure to install the water-proof membrane is disputed. When the District first complained about this failure, in a March 13, 1975 letter, Crough asserted that the work had been delayed due to cold weather, i.e., temperatures below 35 degrees Farenheit. When the District again complained about the delay, in a July 22, 1975 letter that noted the fact that temperatures had been above 35 degrees for several months, Crough did not respond. Then, in an August 19, 1975 letter, Crough informed the District that Teniseal was demanding a cost adjustment (of $156,345.17 over the original contract price of $15,600) before it would perform the work as described in BCD 19.[2] Finally, at a hearing before the Board, Crough's president testified that it was necessary to install the membrane, mastic leveling coat, and deck drains in one continuous process. Thus, Crough asserted, it was unable to install the waterproof membrane until Teniseal was ready to install the other layers.[3]

The District opines that the real cause of the delay throughout the Summer of 1975 was that Teniseal came to realize that it had bid too low and consequently refused to perform the work for the original contract price. The District suspected that Crough and Teniseal were using BCD 19 as a means of compensating for the low bid on the original work.

In any case, the District rejected Teniseal's cost adjustment proposal on grounds that Teniseal's documentation failed to provide a breakdown of the projected cost

---

1. In addition to these building specifications, the contract also provided standard terms governing the relations of the parties. Among such terms was Article 3, which provided for "equitable adjustment of the contract price or completion date," provided that the contractor submit a written claim for adjustment within ten days of the date on which the change was ordered. Article 3 also provided that "[n]othing in this article shall excuse the contractor from proceeding with the prosecution of the work so changed." The contract also provided for liquidated damages of $400 for each day of delay in completing the school.

2. Included in the cost adjustment proposal was a 10% contracting fee of $14,213.20 to be paid to Crough.

3. With respect to Crough's claim that the work could not be performed safely because the contract required the use of a roller, see Part V, infra.

increase, *i.e.*, the proposal did not identify specific cost increases to BCD 19 or identify credits from the previous design. The District directed Crough to "re-submit your complete proposal [for a cost adjustment] in an acceptable form as soon as possible." Apparently, Crough did not re-submit; nor did it install the waterproof membrane.

On September 5, 1975, the District directed Crough to get prices and information on several brands of deck surface material other than those sold by Teniseal. Crough replied that the specified brands either were sold only by Teniseal or unsuitable for the project. A District official suggested that Crough consider using a surfacing material called Dex–O–Tex, and Crough promised to investigate its availability and suitability for the job.

Conway Roofing Co. ("Conway"), one of Crough's subcontractors, advised the District that a waterproof membrane of four-ply asphalt saturated felt could be installed as an interim measure, with the upper surfacing layers to be added later. On September 16, 1975, the District, acting on this advice, directed Crough to install a waterproof membrane of asphalt saturated felt, as opposed to the more expensive cotton membrane called for in the original contract, as an interim measure.

Conway installed the felt waterproof membrane in November 1975; however, neither Crough nor Teniseal installed the mastic leveling course or wear surface over it. On October 27, 1976, the District issued BCD 19 Amendment 4, which deleted from Crough's contract responsibility for installing the mastic leveling course and wearing surface layers. These layers were installed by other contractors using materials other than those sold by Teniseal, including Dex–O–Tex.

### Administrative proceedings.

Completion of the school was greatly delayed, with some of the delay attributable to problems with the roof.[4] Concerning these roof-related delays, the District asked the Contracting Officer for, and was awarded, liquidated damages. Crough appealed this decision to the Board.

The Board's decision included matters and claims not at issue here. However, concerning the delays associated with the roof, the Board agreed with Crough that the contract specifications relating to the top three layers of the roof play areas called for a sole-source supplier. However, the Board found that Crough's "own dereliction" in failing to proceed with the installation of the roof after the bituminous concrete fill had been installed caused "the need for repair to the roof" and the attendant delays. The Board also found that Crough's dereliction was not excused by defects in the District's specifications, as asserted by Crough in its defense, because Crough had failed to carry its burden of showing, through "reasonable and diligent attempts to comply with the challenged specifications," that such specifications were impossible of performance.

This appeal followed.[5] Crough charges, *inter alia*, that the Board erred by (1) failing to find that the District breached its warranty of commercial availability by implicitly specifying a sole source supplier who could not provide the materials called for under the contract with the required five-year guarantee; (2) finding that Crough was responsible for delays occurring after August 19, 1975; and (3) failing to find that the District breached its duty to mitigate damages.

### II

### A

### *The warranty of commercial availability.*

■ The warranty of commercial availability originated in government contract

---

4. Other sources of delay included strikes, the late connection of utilities, and problems caused by various subcontractors. These events raised other claims for damages not related to the roof and not in issue in this appeal.

5. The standard of review applicable to this appeal is set out in D.C.Code § 1–1510 (1987 Repl.). This court may set aside any findings and conclusions that are capricious, unsupported by substantial evidence, abusive of discretion, or otherwise not in accordance with the law.

cases, such as *Aerodex, Inc. v. United States*, 189 Ct.Cl. 344, 417 F.2d 1361 (1969),[6] in which the government puts out for bid a contract specifying the use of brand name components that later prove to be unavailable on the commercial market. The practice of specifying brand name components is often used when a description of the technical construction of the component is not available; thus, the practice is a form of shorthand in which the government specifies Brand X "or equal" rather than spelling out the engineering specifications that go into making the component. Problems arise, however, when the specified component, "or equal," is not commercially available.

Such was the case in *Aerodex*, in which the sole manufacturer of a component specified by the government refused either to sell the component to the contractor or to make available to the contractor the component's specifications for in-house fabrication.[7] In such cases, contractors may find themselves unable to perform, or able to do so only by meeting the terms imposed upon them by recalcitrant manufacturers.[8]

Recognizing the unfairness of the burden imposed upon contractors in such situations, the Claims Court, writing in *Aerodex*, held that

[i]t is the obligation of the Government to ascertain and assure to bidders the commercial availability of the component [specified in the contract] from its manufacturer before it employs it as a purchase description or, failing that, to provide bidders with a sufficient description of the physical specifications and performance characteristics so that it may be duplicated by the bidders either by in-house fabrication or by purchase from suppliers. Here the Government did neither. It was improper for the Government to cast this burden of advance ascertainment upon bidders without explicit warning to them of the questionable availability and physical makeup of the component.

*Id.* at 1366.

Thus, by including a "brand name" product or component in the specifications of a contract put out for bid, the government warrants the commercial availability of that product or component.

### *Limits on the warranty of commercial availability.*

■ While the warranty of commercial availability shifts the risk of nonperformance due to commercial unavailability from

---

**6.** *Aerodex* was decided by the United States Court of Claims. Pursuant to the Federal Courts Improvement Act of Apr. 2, 1982, Pub.L. No. 97–164, 96 Stat. 25, codified in 28 U.S.C.A. §§ 171–177 (effective October 1, 1982), the Court of Claims was abolished and its jurisdiction was split between the United States Claims Court, which took over its trial responsibility, and the Court of Appeals for the Federal Circuit, which received its appellate function. *See, generally,* Steadman, Schwartz, and Jacoby, LITIGATION WITH THE FEDERAL GOVERNMENT, Ch. VI (2d ed. 1982). Pursuant to General Order No. 1, 1982, 1 Cl.Ct. 1 XXI, the Claims Court adopted as binding precedent the decisions of the former tribunal.

**7.** In *Aerodex*, the plaintiff-general contractor was awarded a contract to provide 233 probe thermistor mounts for missile guidance to the Army at a cost of $61.94 each with delivery in installments from 180 to 240 days after the award. The "electronic nerve center" of the mounts was a pair of matched thermal resistors. The contract specified that the thermal resistors be Western Electric Company's Part No. GA51387, Items 1B and 2B "or approved substantial equal." Based on its experience in the

electronics field, Aerodex expected to make its own resistors in-house at a cost of $1.43 each.

When Aerodex reached the stage of performance in which the resistors were to be installed, it learned that (1) the government lacked the material specifications for the resistors, and (2) that Western Electric refused to sell the resistors separately. Eventually, this impasse was resolved when another supplier was found who could build an acceptable substitute.

Afterwards, Aerodex sought an equitable adjustment based on the government's failure to provide it with material specifications for the resistors. The government's defense was that it had no duty to supply material specifications and that Aerodex should have inquired in advance of bidding as to the availability of the resistors.

**8.** For example, in *Aerodex*, Western Electric offered to subcontract the entire thermistor mount at a cost of $310.41 each with delivery in not less than 34 weeks, as compared with Aerodex's contract price of $61.94 with delivery in 180 to 240 days.

the contractor to the government, it does not relieve the contractor of any of the usual risks of non-performance stemming from the contractor's relationship with sub-contractors. As it was put in *General Ship Corp. v. United States*, 634 F.Supp. 868 (D.Mass.1986),

> Designating a particular subcontractor in the contract between [the government] and the prime contractor does not ... shift the entire risk of the subcontractor's non-performance, defective performance, or untimely performance to [the government]. The prime contractor bids on and enters the contract, knowing and accepting the designation of the subcontractor. In its subcontract it provides whatever measure of protection it thinks it needs.

*Id.* at 869.

Thus, the warranty of commercial availability is a limited one. The warranty means that the sole-source supplier is capable of providing the specified product. *Interstate Coatings, Inc. v. United States*, 7 Cl.Ct. 259, 261 (1985); *Franklin E. Penny Co. v. United States*, 207 Ct.Cl. 842, 524 F.2d 668, 674–75 (1975); *Cascade Elec. Co.*, ASBCA No. 28674, 84–1 B.C.A. ¶ 17,210 (1984). It does not extend to the willingness of a supplier to provide the specified product "within the time period specified by the contract." *Franklin E. Penny Co., supra*, 524 F.2d at 675. Similarly, "the unexcused performance failure by a Government directed sole-source supplier does not relieve the contractor from its obligation to complete performance within the time period specified in the contract." *Cascade Elec. Co., supra*, 84–1 B.C.A. ¶ 17,210 at 85,683. Nor does the warranty extend to "the terms and conditions insisted upon by a supplier," *Bogue Elec. Mfg. Co.*, ASBCA Nos. 25184, 29606, 86–2 B.C.A. ¶ 18,925 at 95,480 (1986), or the price. *Arnold M. Diamond, Inc.*, ASBCA No. 22733, 78–2 B.C.A. ¶ 13,447 at 65,720 (1978). Moreover, there is no warranty that the sole-source supplier will perform whatever subcontract it enters into with the contractor. *General Ship Corp. v. United States*, 634 F.Supp. 868, 870 (D.Mass.1986). *See also Paccon, Inc. v.*

*United States*, 185 Ct.Cl. 24, 399 F.2d 162, 168 (1968) (a warranty that would impose upon the government the burden of guaranteeing the performance of third parties without regard to any fault of its own is an unusual assumption of responsibility that "should not be inferred from ambiguous, inconclusive, or general discussions").

## B

### *Whether the contract designated a sole-source supplier.*

■ Crough contends that the District wrote its technical specifications "around" a sole-supplier, by which it means that only Teniseal could provide both the specified materials and the specified five-year guarantee. Thus, Crough concludes, the government implicitly designated Teniseal as a sole-source supplier, which in turn triggered the government's warranty of commercial availability.

The Board's Findings of Fact support this theory in part. The Board found that "[t]he specifications for the wearing surface of the roof required materials made by only two known manufacturers, and the local area supplier for those manufacturers was the Teniseal Corporation. Teniseal in subcontracting with appellant bid on the basis of the material of one manufacturer." *Decision of the Board*, Aug. 9, 1985 at 19. Thus, this was unlike the situation in *Aerodex*, in which there was one and only one manufacturer. In theory, at least, the materials were available from one or the other manufacturer and/or from another supplier.

However, this analysis does not address the whole of Crough's contention. The contract specified both materials *and* a five-year guarantee. Apparently, provision of the guarantee was predicated on the use to which the material would be subjected. Moreover, it appears that the material had to be installed by the supplier, Teniseal, and the supplier seems to have had some hand in determining whether the guarantee could be provided under the circumstances of that installation. In other words, Crough could not satisfy its contractual

obligation simply by purchasing the material and installing it; Crough was also required to provide a five-year manufacturer's guarantee and, thus, Crough really had to deal with a supplier/installer.

Teniseal was the only local supplier/installer. Based on its review of the District's roof design, Teniseal would not provide the required guarantee, because, in its view, the base for its product was too soft. Although it can be argued that Crough was free to go outside the area to find another supplier/installer, such an argument is meritless in view of the fact that the District agreed with Teniseal's view of the roof design and, in response to Teniseal's objections, altered the design of the roof.

Thus, it is fair to say that Crough found itself in the position of having to deal with a sole-source supplier. It is also fair to say that by implicitly designating a sole-source supplier, the District warranted the commercial availability of the specified roofing materials *with* a five year guarantee.

*Whether the materials specified in the contract were in fact commercially unavailable.*

■ Although we are satisfied that Crough has shown that the District triggered the warranty of commercial availability in this instance by designating a sole-source supplier for the roofing materials specified in its contract for the school, Crough cannot prevail without also showing a breach of that warranty. Specifically, Crough must show that the roofing materials specified in the contract, including a five-year manufacturer's guarantee, were, in fact, commercially unavailable. However, Crough fails to do this for the simple reason that Teniseal was willing to

provide the materials with a five-year guarantee, once its concerns regarding the roof design were met by the District's decision to alter that design in BCD 19.

Unlike the situation in *Aerodex*, in which the supplier refused to sell the required component to the contractor, Teniseal was quite willing to sell the specified materials, with the required five-year guarantee, to Crough. The only obstacle to such sale was that Teniseal judged the roof design to be such that it could offer the five-year guarantee. The District obviously agreed with Teniseal's assessment and promptly met with its architect-engineer to change the roof design. Once the design change was complete, Teniseal agreed to provide the five-year guarantee.

Thus, it cannot be said that the materials were commercially unavailable, within the meaning of *Aerodex*. At most there was a temporary refusal on the part of the supplier to provide part of the specified material, the five-year guarantee. That this partial refusal was justified is clear from the District's decision to revise its roof design in response to it. Moreover, once the design was changed, the partial refusal was withdrawn and the materials as specified were commercially available to Crough.[9]

### III

■ Crough contends that whatever its responsibilities may have been during the initial (pre-BCD 19 or 8/14/74) and intermediate (post-BCD 19) phases of the contract period, circumstances were such after August 19, 1975, when Teniseal first informed the District that it would not perform without a cost adjustment, that the materials once again became commercially unavailable due to the actions of the District, and

9. Crough attacks the CAB's finding that Teniseal was "unwilling" rather than unable to provide the five-year guarantee, contending that this finding is not supported by the evidence. In support of this contention, Crough points to Teniseal's letter to the District refusing to provide a guarantee on the basis of the original design, in which Teniseal used the words "can not" (*i.e.* we "can not" provide a guarantee on the basis of the original design) instead of will not. Citing Webster's dictionary, Crough goes

on to argue that "can not" means " 'unable to do, make or accomplish.' " Thus, in Crough's view, the evidence shows that Teniseal was unable to perform and, thus, the material was commercially unavailable.

This hypertechnical argument collapses of its own weight. Crough simply reads too much into the author's choice of words. In any case, Crough's contention that Teniseal was unable to perform is belied by the fact that it agree to perform once BCD 19 was issued.

thus Crough cannot be held responsible for failure to perform.

We see no merit in this argument. The delays charged to Crough after Teniseal's August 19, 1975 refusal to perform were not caused by commercial unavailability. Rather, they were caused by a combination of (1) Teniseal's refusal to honor its subcontract with Crough, a matter beyond the District's control or responsibility, and (2) damage to the building's interior from water leakage because Crough failed to install the waterproof membrane on the roof between October 1974 and September 1975.

At issue is the delay during the period beginning with Teniseal's August 19, 1975 cost adjustment proposal and ending with the deletion of Crough's responsibility for the roof in October 1976. Crough contends that the District was responsible for this delay on the theory that the District created an impasse by failing either to (1) grant Teniseal's cost adjustment, or (2) change the design of the roof to allow Crough to substitute other materials and/or another contractor. Stated differently, Crough contends that it was forced to stay with Teniseal, because only Teniseal could provide materials meeting the contract specifications, until such time as the District either changed the specifications or satisfied Teniseal's demands.

In support of its theory, Crough notes that, indeed, once the District did change the contract by eliminating the materials that were to be provided by Teniseal, other contractors were able to install the roof using different materials. Thus, Crough contends that it could not have completed installation of the roof, because the materials were available only from Teniseal and Teniseal was refusing to perform.

The Board found that Crough was responsible for the delay after BCD 19 was issued, because (1) it failed to install the waterproof membrane, and (2) it failed despite numerous requests to provide details explaining why Teniseal's work under BCD 19 required a ten-fold increase in cost. We are satisfied that these findings are supported by the evidence in the record before us.

First, Crough had a contractual obligation to install the waterproof membrane, and Crough does not contend that installation of the waterproof membrane was beyond its ability or that it was prevented by unavailability of the material. As the Board found, the contract specifications called for installation of the waterproof membrane immediately after installation of the bituminous fill. Both parties agree that Crough did not install the waterproof membrane from October 1974 until September 1975, despite repeated requests from the District that it do so.

■ Second, contrary to Crough's suggestion that the District had to respond to the cost adjustment proposal submitted by Teniseal and Crough by either caving in or changing the roof design again, the District was well within its rights in insisting that the proposal include a breakdown of credits and cost increases. Article 3 of the contract provided for "equitable adjustment of the contract price or completion date," provided that the contractor submit a written claim for adjustment within ten days of the date on which the change was ordered. The Crough–Teniseal cost adjustment proposal came over a year after the changes were ordered in BCD 19. Neither Teniseal nor Crough ever responded to the District's request for more information. Moreover, Article 3 provided that "[n]othing in this article shall excuse the contractor from proceeding with the prosecution of the work so changed." Thus, Crough had a duty, despite the impasse over Teniseal's request, to install the waterproof membrane.

Third, in September 1975, the District suggested the use of alternative materials to Crough, including the use of a surfacing material called Dex–O–Tex. Ultimately, Dex–O–Tex was used to surface one of the roof play areas by another contractor, after responsibility for the roof play areas was deleted from Crough's contract. There is no indication that Crough ever responded to the suggestion that it use Dex–O–Tex. In any case, by suggesting its use, the District provided Crough with what proved to be a viable alternative to the Teniseal

materials. Thus, it cannot be said that the materials needed to surface the roof again became commercially unavailable when Teniseal refused to perform without a cost adjustment. Dex–O–Tex was available.[10] Crough's failure to follow up on the District's suggestion and take advantage of this alternative surfacing material led to yet another year of delay.

In conclusion, we agree with the Board and the District that (1) Teniseal's refusal to perform was a matter between Crough and Teniseal, quite beyond the District's responsibility or control, *see General Ship Corp., supra,* 634 F.Supp. at 869; and (2) Crough could have, and should have, installed the waterproof membrane in October, 1974, or thereabouts, when the bituminous fill was installed. Had Crough done so, delay and damage associated with water damage to the interior could have been avoided. Having failed to do so, from October 1974 through August 1975, Crough cannot avoid responsibility for the delay and damage occurring after September 1975 caused by its earlier failure to perform. Stated differently, Crough's failure to perform had nothing to do with commercial availability—that matter had been resolved by BCD 19—and everything to do with Teniseal's dissatisfaction over the terms of its contract with Crough.

## IV

■ Crough contends that the District breached its duty to mitigate damages caused by the delay in installing the roof by someone else.[11] Our review of the record reveals that Crough raises this issue for the first time on appeal. Therefore, we will not hear it. *See Fowler v. A & A Co.,* 262 A.2d 344 (D.C.1970). However, even if this argument had been made below, it is meritless.

■ The doctrine of avoidable consequences, also known as the duty to mitigate damages, bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury. A. Corbin, 5 CORBIN ON CONTRACTS, § 1039 at 241 (1964). The key is foreseeability, which, in this context, means damages that the District "should have foreseen and could have avoided by reasonable effort

10. Crough contends that no alternative to the Teniseal materials was "ever" available and implies that all of the District's attempts to find an alternative play deck surface met with failure, forcing the District eventually to give up on having play decks at all. The record does not support this contention.

The record indicates that Dex–O–Tex was in fact installed as a substitute for the Teniseal surfacing materials on the play deck portions of the roof and was acceptable as a play deck surface. However, it appears that subsequent to the installation of Dex–O–Tex, serious problems developed with respect to leakage around planter boxes and an expansion joint on the roof, problems attributable to faulty installation and/or design. In addition, use of the building apparently was changed from an elementary school to a middle school. Eventually, the play areas were removed and an entirely new roof was installed.

Thus, the District's decision to eliminate the roof play areas is explained by only two reasons, leakage problems and/or change in use. Even assuming *arguendo* that the reason for the elimination was water leakage and that responsibility for that leakage lay with the District's faulty design, there is no evidence that use of the Teniseal materials would have made any difference regarding the leakage problems. Thus, it cannot be said that Dex–O–Tex was unsuitable or linked in any way to the elimination of the play decks. Rather, it appears that Dex–O–Tex was a viable alternative to the Teniseal materials. Furthermore, use of Dex–O–Tex, at the point in time when the District suggested it to Crough as an alternative, would have prevented a year of delay. The leakage problems that eventually developed with respect to the planter boxes and expansion joints would have happened anyway. The point is that the leakage problems would have been revealed sooner. Moreover, by installing Dex–O–Tex, Crough would have avoided its eventual breach.

Therefore, we conclude that Dex–O–Tex was a viable alternative, and, thus, its availability rebuts Crough's contention that it was excused from performance by the "commercial unavailability" of an alternative to Teniseal's surfacing materials.

11. Crough provides no case authority; it cites RESTATEMENT (SECOND) CONTRACTS, § 350. Crough's central argument seems to be that by the Fall of 1985, the District should have been smart enough to realize that Crough was never going to resolve its problem with Teniseal and install the roof, and, thus, the District should have removed responsibility for the roof from Crough right away, rather than wait until October 1976 to do it.

without undue risk, expense, or humiliation." J. Calamari & J. Perillo, THE LAW OF CONTRACTS, § 14–15 at 538 (1977), citing RESTATEMENT OF CONTRACTS § 336(1). The efforts undertaken in this regard need not be successful, so long as they are reasonable. *Id.* at 539. The burden of proving that the losses could have been avoided rests with the breaching party. CORBIN, *supra* § 1039 at 251. *See also G & R Corp. v. American Sec. & Trust Co.*, 173 U.S.App.D.C. 215, 523 F.2d 1164, 1176 (1975); *Volos, Ltd. v. Sotera*, 264 Md. 155, 286 A.2d 101, 112 (1972).

■ The duty to mitigate does not obtain so long as the breaching party "has not definitely repudiated the contract and continues to assure that plaintiff that performance will take place." CORBIN, *supra* § 1039 at 249. Similarly, the duty does not apply where the defendant itself has prevented the plaintiff from taking steps to avoid or reduce losses. *Id.* at 250–251. Of special importance in this case, "[t]he duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance." *Shea–S & M Ball v. Massman–Kiewit–Early*, 196 U.S.App.D.C. 338, 342, 606 F.2d 1245, 1249 (1979), quoting *Parker v. Harris Pine Mills*, 206 Or. 187, 291 P.2d 709 (1955). "In such cases, while the contract is subsisting and in force, such party cannot be heard to say that plaintiff might have performed for him." *Parker v. Harris Pine Mills, supra*, 291 P.2d 709, 717.

In view of the above, we see no merit in Crough's argument that the District failed to mitigate the damages for which Crough was charged, *i.e.*, the days of delay stretching from the Fall of 1975 to October 1976.

First, Crough did not repudiate the contract and gave assurances to the District that performance would take place. Thus, no duty to mitigate arose. CORBIN, *supra* § 1039 at 249. Crough's assurances came in two forms of conduct.[12] There was conduct relating specifically to the roof play areas, as in Crough's investigation of alternate materials and supplies at the behest of the District, which clearly indicated that Crough was willing to perform. In addition, there was Crough's conduct as the general contractor. The evidence suggests that Crough continued to perform its other obligations under the general contract, by which it gave assurance that it would continue to honor the contract. Therefore, we see no grounds for finding that the District knew or should have known that Crough would not perform. Rather, the opposite is true: the District had good reason to expect that Crough would perform.

■ Moreover, it must be recalled that the burden of proving that the damage could have been avoided rests with the breaching party. CORBIN, *supra* § 1039 at 251. *See also G & R Corp. v. American Sec. & Trust Co., supra*, 523 F.2d 1164, 1176; *Volos, Ltd. v. Sotera, supra*, 286 A.2d 101, 112. Significantly, there is no evidence to suggest that Crough at any time indicated that it was even considering repudiating the contract, much less that the District knew, or had reason to know, that Crough would never perform. Thus, Crough fails to carry its burden of showing that the District was in a position to avoid the damages that followed from Crough's non-performance.

Second, like the situation described above in *Shea–S & M Ball*, Crough had primary responsibility to perform under the contract, had an opportunity to perform that was at least equal to that of the District— if not superior, and had a knowledge of the consequences of nonperformance at least equal to that of the District—if not superior. Thus, Crough "cannot be heard to say that the Plaintiff might have performed for

---

12. As Professor Corbin has put it, "[e]xamples of 'tacit' promises and of promises to be inferred from action are innumerable." CORBIN, *supra*, § 562 at 288. Since an assurance is, at most, a promise to perform, (and probably is less, given the absence of consideration), and since we are in the habit of inferring promises from conduct, we see no principled reason why we may not infer an assurance from conduct as well. This seems particularly sound in view of the conduct at hand.

him." *Parker v. Harris Pine Mills, supra,* 291 P.2d 709, 717.

Third, the duty to mitigate was made inapplicable by negotiations carried out between the District and Crough to secure performance. *See* CORBIN, *supra,* § 1039 at 249. Specifically, in the Fall of 1975, after it was learned that Teniseal would not perform without a cost-adjustment, the District suggested alternative surfacing materials to Crough and directed it to seek suppliers and price quotes. Crough responded that the suggested materials were either unsuitable or available only from Teniseal. The District then suggested another alternative surfacing material called Dex–O–Tex, which was subsequently used on one roof by Crough's successor, and directed Crough to investigate its suitability and availability. This action by the District constituted negotiation with Crough to secure performance and, thus, made the duty to mitigate inapplicable. *Id. See also United States v. Russell Elec. Co.,* 250 F.Supp. 2 (S.D.N.Y.1965) (plaintiff not required to relet contract to supply gyro motors immediately upon breach by defendant where defendant and defendant's successor negotiated for one year following breach regarding possibility of substituting successor's performance for that of defendant); *Sheldon v. Northeast Developers, Inc.,* 127 Vt. 15, 16, 238 A.2d 775, 776 (1968) (plaintiff excused from duty to mitigate "for at least as long as the plaintiff was reasonably entitled to expect the defendant might act."). Therefore, it cannot be said that, under the circumstances, the District should have foreseen that Crough would continue its failure to install the roof. Rather, it seems that the District relied on Crough to continue investigating the use of Dex–O–Tex or other materials and/or to work things out with Teniseal, while at the same time continuing to perform its general contracting duties. Once it became clear that Crough would not perform, the District took appropriate steps to have the work performed by another contractor.

In short, Crough is trying to turn the tables on the District by blaming the District for Crough's own failure to perform. We do not see why Crough should be rewarded for failing to perform or repudiate.[13]

V

Finally, Crough contends that it was excused from installing the waterproof membrane, because installation required use of a 1,500 lbs. to 3 ton roller and it was not clear at the time whether the roof would support such machinery. Crough contends that the District never responded to concerns raised by Crough's president, a structural engineer, that the roof as designed in BCD 19 would not support the required 1,500 lbs. to 3 ton roller needed to install the waterproof membrane. Thus, in Crough's view, the District breached its duty to cooperate with Crough.

As a preliminary matter, it must be said that when the District complained to Crough about its failure to install the waterproof membrane in March and July of 1975, Crough did not raise safety as a reason for the delay. Instead, Crough pointed to cold weather and Teniseal's refusal to perform.

In any case, Crough fails to meet its burden on this issue. When the government provides specifications, it warrants that, if followed, satisfactory performance can be accomplished. *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). However, the contractor, not the government, has the burden of proving that the specifications are defective and that the defects caused the difficulties encountered. *Bailfield Indus., Div. of A–T–O, Inc.,* ASBCA No. 18057, 77–1 B.C.A. ¶ 12,348 (1977). Where the specifications are factually impossible or commercially impracticable to perform, the contractor's delays are excusable and costs associated with them are usually recovera-

13. Articles 3 and 15 clearly spelled out the process by which disputes over cost adjustment were to be worked out. Part of that procedure was the requirement that Crough continue working pending resolution.

ble. *See Natus Corp. v. United States,* 178 Ct.Cl. 1, 371 F.2d 450 (1967); *Hol–Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634 (1966). However, the burden is on the contractor to prove impossibility, *Koppers Co. v. United States,* 186 Ct.Cl. 142, 405 F.2d 554, 564 (1968), and attempted compliance with the specifications is a prerequisite to meeting this burden. *See Arvol D. Hays Constr. Co.,* ASBCA No. 25122, 84–3 B.C.A. ¶ 17,661 at 88,063–066 (1984).

As the Board found in its decision below, Crough failed to meet its burden of proof. In the first place, the record shows that Crough did not attempt to perform and, thus, failed to meet the prerequisite to carrying its burden. Second, the District's own structural engineer disputed the contention by Crough's president and structural engineer that a roller could not be used safely. Finally, neither party put on expert testimony on this issue. We find no error in the Board's resolution of this issue.

### VI

For the foregoing reasons, the decision of the Board is

*Affirmed.*[14]

---

**14.** We also find no merit in Crough's contention that it is inequitable for the District to insist on the installation of a roof worth over $100,000 for $15,600. Thus, Crough seems to acknowledge the accuracy of the District's conjecture that Teniseal's refusal to perform was motivated by its realization that it had underbid the job.

First, the District never refused a cost adjustment relating to the changes ordered in BCD 19; it merely demurred when asked to provide one on the basis of a proposal that failed to include a cost breakdown.

Second, it is hornbook contract law that unilateral mistake by a subcontractor in preparing a bid is not grounds for rescission, unless the other party knew, or had reason to know, of the mistake or some other condition allowing relief obtains. *See J. Calamari & J. Perillo,* THE LAW OF CONTRACTS (1977) § 9–27 at 367. Teniseal gave its bid to Crough and, subsequently, entered into a contract with Crough. Thus, any dispute over the bid is between Crough and Teniseal.

Further, we find no merit to Crough's contentions with respect to liquidated damages covering the period from April to August 1974 or to any of its other contentions.